# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JORDAN LEWANDOWSKI, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>TAL EDUCATION GROUP, and BANGXIN ZHANG,<br><br>    Defendants. | Case No:  2:23-cv-01769-MEF-JRA<br><br>Hon. Michael E. Farbiarz, U.S.D.J.<br><br><u>CLASS ACTION</u><br><br>ORAL ARGUMENT REQUESTED<br><br>MOTION DATE:  April 15, 2024 |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS THE AMENDED COMPLAINT
## ON BEHALF OF DEFENDANTS

---

Kevin H. Marino
John D. Tortorella
**MARINO, TORTORELLA**
**& BOYLE, P.C.**
437 Southern Boulevard
Chatham, NJ 07928-1488
Telephone: (973) 824-9300
Facsimile: (973) 824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

*Attorneys for Defendants*

Michael B. Carlinsky[†]
Xiao Liu[†]
Jacob J. Waldman[†]
**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
michaelcarlinsky@quinnemanuel.com
xiaoliu@quinnemanuel.com
jacobwaldman@quinnemanuel.com

---

[†] Application for admission *pro hac vice* forthcoming.

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ................................................................................................... 4

    A.    Parties ....................................................................................... 4

    B.    The Double Reduction ............................................................. 4

    C.    TAL Informed Investors in Public Filings That TAL Might Be Unable to Comply Timely, or at All, with All Applicable Regulations ............................................................................... 5

    D.    The Amended Complaint .......................................................... 7

LEGAL STANDARD ............................................................................................ 8

ARGUMENT ......................................................................................................... 8

I.    PLAINTIFFS FAIL TO PLEAD SCIENTER .................................................. 8

    A.    Plaintiffs Do Not Attempt to Plead Motive ............................ 9

    B.    Plaintiffs Fail to Plead With Particularity What Is Prohibited By the Double Reduction Policy Directives ................................. 10

    C.    Plaintiffs Fail to Plead Any Individual Defendant's Knowledge of What the Double Reduction Prohibited ................................ 15

    D.    Allegations Concerning a Handful of Infractions During the 15-Month Class Period Cannot Support Scienter .................... 17

    E.    Plaintiffs Fail to Attribute Knowledge to Former Employees With Sufficient Particularity ................................................... 19

    F.    The Non-Fraudulent Inference is the Sole Plausible Inference .......... 22

II.    PLAINTIFFS FAIL TO ALLEGE ACTIONABLE MISSTATEMENTS ............................................................................ 23

    A.    TAL's Warning Language Precludes Plaintiffs' Falsity and Materiality Claims .................................................................. 23

    B.    Plaintiffs' Scattered, Unverified Allegations Concerning TAL's Curricula Do Not Establish Falsity ....................................... 25

i

       1.    Plaintiffs' Allegations Concerning Curricula Do Not Support Falsity With Particularity ...............................................26

       2.    Plaintiffs' Allegations Concerning TAL Promotional Materials and Want-Ads Do Not Support Falsity.....................32

    C.    The Handful of Alleged Infractions Does Not Render False TAL's Statements About Its Revised Curricula .................................34

    D.    Plaintiffs Fail To Plead Falsity for Additional, Statement-Specific Reasons..................................................................................36

CONCLUSION ...................................................................................................40

# TABLE OF AUTHORITIES

**PAGE**

## <u>Cases</u>

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ..................................................................................8

*Africa v. Jianpu Tech. Inc.*,
  2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) ................................24, 34, 35, 39

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ................................................................ 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................8

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008) ..................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .................................................................................40

*Auctus Fund, LLC v. NuGene Int'l, Inc.*,
  2021 WL 1069462 (D. Mass. Mar. 19, 2021) .....................................................39

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................8

*Boca Raton Firefighters' and Police Pension Fund v. Devry Inc.*,
  2012 WL 1030474 (N.D. Ill. Mar. 27, 2021) .....................................................35

*Cal. Pub. Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ....................................................................20, 21, 23

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
  2019 WL 2865452 (D.N.J. July 3, 2019) ...............................................11, 20, 21

*In re Chembio Diag., Inc. Sec. Litig.*,
  586 F. Supp. 3d 199 (E.D.N.Y. 2022)...............................................................16

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ...............................................................................39

iii

*In re Draftkings Inc. Secs. Litig.*,
   650 F. Supp. 3d 120 (S.D.N.Y. 2023) .....................................................10, 11, 16

*In re Elecs. for Imaging, Inc. Sec. Litig.*,
   2019 WL 397981 (D.N.J. Jan. 31, 2019)..............................................................8

*Francisco v. Abengoa, S.A.*,
   481 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................................39

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018) ..........................................................16, 18

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
   2017 WL 1536223 (D.N.J. Apr. 27, 2017)...........................................................9

*Ikeda v. Baidu, Inc.*,
   2021 WL 1299046 (N.D. Cal. Apr. 7, 2021)......................................................38

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ................................................................................9

*In re ITT Educ. Svc., Inc. v. Sec. and S'holder Deriv. Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) ................................................................37

*Jacobowitz v. Range Res. Corp.*,
   596 F. Supp. 3d 659 (N.D. Tex. 2022) ...............................................................24

*Karam v. Corinthian Colleges, Inc.*,
   2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) .............................................18, 35

*Kauffman v. Nat. Health Trends Corp.*,
   2019 WL 7165921 (C.D. Cal. Dec. 20, 2019).............................................12, 19

*Kemp v. Univ. Am. Fin. Corp.*,
   2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) .........................................................37

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ................................................................16

*In re Metris Cos., Inc. Sec. Litig.*,
   428 F. Supp. 2d 1004 (D. Minn. 2006)...............................................................39

iv

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................21

*Okla. Firefighters Pension and Ret. Sys. v. Capella Educ. Co.*,
   873 F. Supp. 2d 1070 (D. Minn. 2012)..............................................37

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)............................................................................38

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) .............................................................17

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018)...............................................35

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) .................................................................10

*In re Qudian Inc. Secs. Litig.*,
   2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ...................................25

*Sandoz v. Waterdrop, Inc.*,
   2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023) .......................................24

*Sapir v. Averback*,
   2016 WL 554581 (D.N.J. Feb. 10, 2016) ..............................................9

*Sun v. TAL Educ. Grp.*,
   2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023) ...................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...............................................................................9

*In re Tenet Healthcare Corp. Sec. Litig.*,
   2017 WL 11638941 (N.D. Tex. Dec. 20, 2017)..................................35

*In re Xunlei Ltd. Secs. Litig.*,
   2019 WL 4276607 (S.D.N.Y. Sept. 10, 2019) ............................10, 12

## **Rules/Statutes**

15 U.S.C. § 78u-4(b)(1) ..............................................................................23

15 U.S.C. § 78u-4(b)(2)(A)...........................................................................8

Federal Rules of Civil Procedure 9(b) .....................................................1, 21, 23

Federal Rules of Civil Procedure 12(b)(6) ................................................1

Defendants TAL Education Group ("TAL," or the "Company"), Bangxin Zhang, Alex Peng, and Jackson Ding (the "Individual Defendants," and together with TAL, "Defendants"), respectfully submit this Memorandum of Law in support of Defendants' Motion to Dismiss the Amended Complaint ("AC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Litigation Securities Reform Act of 1995 ("PSLRA").

## PRELIMINARY STATEMENT

TAL is a leading provider of extra-curricular tutoring services in China. In July 2021, after issuing a series of increasingly strict regulations, the Chinese government promulgated policy directives known as the "Double Reduction," which required publicly traded tutoring companies like TAL to revise their curricula according to certain high-level guidelines, and which Plaintiffs allege prohibited TAL from teaching "academic" subjects (though neither the Double Reduction nor Plaintiffs defines that term). TAL informed investors in the months following the Double Reduction that TAL ceased offering some of its existing courses and was working to comply with the Double Reduction, including by revising its curricula and course offerings, while continuing to seek guidance from government authorities regarding these same directives.

In March 2023, the *Cailian Press Agency*, a Chinese media outlet, allegedly reported (the "*Cailian* Report") that TAL had in fact continued to teach its pre-

1

Double Reduction curricula of "academic" subjects, and failed to conform to the new regulations. Plaintiffs rely on the *Cailian* Report to claim that TAL essentially was teaching the same courses under new names designed to (somehow) avoid scrutiny. Plaintiffs allege that the *Cailian* Report made clear that certain public statements by Defendants about compliance with the Double Reduction and TAL's course offerings made between January 2022 and March 2023 were false, and that the price of TAL's American Depositary Shares ("ADS") fell in the wake of these purported revelations.

Plaintiffs' action depends upon pleading with particularity that TAL in fact breached the Double Reduction, and therefore that TAL's statements concerning its compliance and course offerings were false. But the Amended Complaint fails fundamentally to allege what the Double Reduction **actually prohibits**. Plaintiffs cite media reports quoting small portions of this regulatory issuance and seeking to interpret the new regulations, but do not plead the full content of the Double Reduction itself, nor plead any explanatory issuances from the Chinese government. Plaintiffs cannot plead with particularity that Defendants breached regulations where Plaintiffs do not allege with specificity the contents of those regulations, or how they are interpreted and applied. Indeed, Plaintiffs' claim rests almost entirely on the assertion that, contrary to the Double Reduction, TAL continued to teach "academic" subjects, without even defining the term "academic." Notably, the

2

*Cailian* Report itself, on which Plaintiffs base much of their case, argues that the question of what is, and is not, "academic" "needs urgent clarification."

Further, and critically, Plaintiffs plead no adverse action in the wake of the *Cailian* Report as against TAL. Plaintiffs claim the *Cailian* Report exposed at TAL a wide-ranging disregard for Chinese law and regulations across hundreds of service centers (as well as an online platform) educating thousands of students. Yet Plaintiffs allege no response from the Chinese government to the *Cailian* Report in the ***five months*** between when it was issued and when Plaintiffs filed the Amended Complaint. In other words, Plaintiffs fail to allege that the authorities charged with enforcing the Double Reduction share Plaintiffs' views, or the *Cailian* Report's suspicion, that TAL was in breach of the Double Reduction during the Class Period.

Thus, Plaintiffs fail to plead that TAL's statements during the Class Period about its course content, or about its regulatory compliance, were false, much less knowingly and intentionally. And Plaintiffs' comparison of unverified TAL curricula to pre-Double Reduction TAL curricula, or to Ministry of Education ("MOE") guidelines, therefore also reflect nothing more than Plaintiffs' (or the media's) own, unauthoritative views of the application of complex Chinese regulations. Indeed, it is simply implausible that TAL sought to conceal the content of its courses across hundreds of service centers serving thousands of students, while, as Plaintiffs allege, *advertising* the content of those same courses and

3

describing them to thousands upon thousands of parents, all while understanding that the Double Reduction came with a robust monitoring and inspection regime. Much more compelling is the non-fraudulent inference that TAL sought to comply with the Double Reduction and, based upon the government's response, has been largely successful.

Plaintiffs' action should be dismissed with prejudice.

## BACKGROUND

### A.    Parties

Lead Plaintiff Xuanjun Meng and additional named Plaintiff Jordan Lewandowski allege they purchased TAL ADS during the Class Period and incurred losses on their investment.  AC ¶ 22.

Defendant TAL is a Cayman Islands company headquartered in Beijing, China specializing in after-school tutoring.  *See id.* ¶ 23.  Defendants (i) Bangxin Zhang co-founded TAL and has been chairman since April 2022; (ii) Alex Peng has been CFO since November 2021 and president since January 2022; and (iii) Jackson Ding has been head of investor relations since 2022.  *See id.* ¶¶ 24-26.

### B.    The Double Reduction

In late July 2021, Plaintiffs allege that "China promulgated its most stringent ever regulation on the after-school tutoring sector."  AC ¶¶ 67-68.  Referred to as the "Double Reduction," Plaintiffs allege it required that "after-school tutoring institutions that provide tutoring on K-9 academic subjects register as non-profits,"

*id*. ¶ 70, "categorically prohibited after-school tutoring institutions that provide K-9 tutoring on academic subjects from either listing on a stock market or raising money in capital markets," *id.*, and imposed "monitoring requirements to ensure compliance, such as review and approval procedures, and inspections," *id*. ¶ 73.

### C.    TAL Informed Investors in Public Filings That TAL Might Be Unable to Comply Timely, or at All, with All Applicable Regulations

Shortly before the Double Reduction, TAL's Form 20-F for the fiscal year ending February 28, 2021, executed as of May 7, 2021, warned that "***Uncertainties with respect to PRC regulatory restrictions on after-school services could have a material adverse effect on us***," Declaration of Kevin H. Marino ("Marino Decl.") Ex. A at 26 (emphasis original), that "***there is no assurance that our operations comply with all applicable regulations in a timely manner***," that "PRC government authorities have significant amount of discretion in interpreting, implementing and enforcing rules and regulations," and that failure to "comply . . . in a timely manner . . . may materially and adversely affect our business and results of operations," *id*. at 27 (emphasis added).

On July 25, 2021, just days after the Double Reduction was released, the Company issued a Form 6-K and press release (Ex. 99.2 to the Form 6-K) informing investors of the new "high-level policy directives" including that "institutions providing after-school tutoring services on academic subjects . . . need to be

registered as non-profit." Marino Decl. Ex. B. The Company expected a "material adverse impact on its after-school tutoring services . . . which in turn may adversely affect the Company's results of operations." *Id.* Critically, recognizing the general nature of the new high-level policy directives, TAL informed investors it would "seek guidance from and cooperate with government authorities in connection with ***its efforts to comply***." *Id.* (emphasis added). Similarly, on November 12, 2021, the Company issued a Form 6-K and press release (Ex. 99.1 to the Form 6-K) noting its "plans to cease offering academic subjects to students from kindergarten through grade nine . . . in the mainland of China by the end of December 2021," and that the Company would "continue to seek guidance from and cooperate with government authorities in various provinces and municipalities in China in connection with ***its efforts to comply*** with the policy directives." Marino Decl. Ex. C (emphasis added). TAL thus made clear that compliance was an ongoing challenge.

TAL's June 14, 2022 Form 20-F for fiscal year 2021 made clear that TAL could not assure compliance with the revised regulations:

> ***Significant uncertainties exist in relation to the interpretation and implementation of, or proposed changes to, the PRC laws, regulations and policies regarding the after-school tutoring industry. In particular, our compliance with the Opinions on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education*** [*i.e.* the "Double Reduction"] ***and the implementation measures issued by the relevant PRC government authorities has had, and could have further, material adverse effect on us.***

Marino Decl. Ex. D at 19 (emphasis original). TAL again explained that the Double

Reduction "contains high-level policy directives in terms of the requirements and restrictions on after-school tutoring institutions," *id.*, and that "[d]ue to the complexity and substantial uncertainty of the regulatory environment, *we cannot assure you that our operations would be in full compliance with applicable laws, regulations and policies, including the* [Double Reduction] *and its implementation measures, in a timely manner, or at all*." *Id.* at 20 (emphasis added). Such non-compliance could cause TAL to incur "fines or other penalties" or require TAL to "terminate certain operations or incur material costs and expenses to comply with such applicable laws, regulations and policies, in which case our business, financial condition and results of operations could be materially and adversely affected further." *Id. See also* Marino Decl. Ex. E (November 1, 2022 Form 20-F/A) at 19-20 (reiterating warnings above).

### D.    The Amended Complaint

The Amended Complaint identifies 13 purported misstatements. AC ¶¶ 144-166; *see also* Appendix A (Chart of Alleged Misstatements). Plaintiffs' essential claim is that each is false because TAL supposedly claimed to be teaching non-"academic" courses consistent with the Double Reduction, while covertly continuing to teach "academic" courses that TAL renamed to avoid detection. The Amended Complaint further asserts that on March 14, 2023, the *Cailian* Report exposed TAL's breaches of the Double Reduction. *See, e.g.* AC ¶ 141.

7

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff cannot meet this standard by pleading "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). To sustain a claim under Section 10(b) of the 1934 Act, and SEC Rule 10b-5, Plaintiffs must plead, among other things, a material misrepresentation or omission, scienter, and loss causation. *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).

## ARGUMENT

## I.     PLAINTIFFS FAIL TO PLEAD SCIENTER

The Amended Complaint includes no particularized allegations supporting a strong inference—much less a compelling one—of scienter on the part of any Defendant. *See* 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs must "stat[e] with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." *In re Elecs. for Imaging, Inc. Sec. Litig.*, 2019 WL 397981, at *6 (D.N.J. Jan. 31, 2019) (internal quotation omitted). Alleging recklessness requires "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the

8

defendant or is so obvious that the actor must have been aware of it." *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *15 (D.N.J. Apr. 27, 2017) (internal quotations omitted), a*ff'd sub nom. In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018).  The inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  These are "exacting pleading requirements." *Id.* at 313.

### A.    Plaintiffs Do Not Attempt to Plead Motive

Plaintiffs do not attempt to allege that any Defendant had motive to commit fraud, such as the sale of Company stock or other personal benefit.  And the general aim of increasing revenue or profitability is not a cognizable motive under the securities laws.  *See Sapir v. Averback*, 2016 WL 554581, at *13 (D.N.J. Feb. 10, 2016) ("[G]eneralized motivations, such as maintaining a high stock price in order to fund operations, are insufficient to establish scienter.").  In any case, "'motive and opportunity' may no longer serve as an independent route to scienter." *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 277 (3d Cir. 2009).  Regardless, absent motive, "the strength of the circumstantial allegations must be correspondingly greater." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008) (citation omitted), *aff'd*, 334 F. App'x 404 (2d Cir. 2009).  Plaintiffs fail to meet this standard.

### B.     Plaintiffs Fail to Plead With Particularity What Is Prohibited By the Double Reduction Policy Directives

Plaintiffs' scienter claims rest on the premise that Defendants knowingly and/or intentionally misrepresented that TAL had ceased offering courses that breached the Double Reduction and sought to comply with applicable regulations, but instead secretly taught the same courses under different names. These assertions fail to support scienter for several reasons.

First, to determine whether Defendants knowingly or intentionally breached the Double Reduction, this Court must determine that a breach occurred, which requires the Court to interpret Chinese regulatory law. Where, as here, "Plaintiffs do not allege that a Chinese legal or regulatory entity has taken formal action . . . the [Amended Complaint] must plausibly allege that notwithstanding this inaction by Chinese authorities, [TAL's] conduct did in fact violate Chinese law during the Class Period." *In re Xunlei Ltd. Secs. Litig.*, 2019 WL 4276607, at *7 (S.D.N.Y. Sept. 10, 2019); *see also id.* at *9 ("Absent conclusive authority on the legality of Xunlei's Rewards Program under Chinese law, the Court must make its own assessment."). And where, as here, "a securities fraud claim is premised on the defendant's predicate violations of law[,] . . . the facts of that underlying violation must be pled with particularity.'" *In re Draftkings Inc. Secs. Litig.*, 650 F. Supp. 3d 120, 156 (S.D.N.Y. 2023) (quoting *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021)).

10

Plaintiffs do not allege any such breach with particularity.  Plaintiffs do not even reproduce the text of the relevant regulatory pronouncements, much less specify what is, and is not, permitted under the Double Reduction.  Plaintiffs' allegations that TAL cannot teach "academic" subjects is insufficient because, among other reasons, Plaintiffs offer no regulatory or other definition of "academic." Rather, Plaintiffs rely on their own self-serving interpretation, or on articles— including the *Cailian* Report—that do not (and cannot) claim to offer authoritative interpretations of applicable regulations.  *See Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *7 (D.N.J. July 3, 2019) (Hayden, J.) (discounting allegations in *Reuters* article because "while newspaper articles can certainly alert investors to wrongdoing, the *complaint* must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders.") (quotation omitted) (emphasis original).  Although it is certainly within the Court's purview to interpret foreign law, the specific provisions and prohibitions of that foreign law must be pleaded with particularity.  Here, they are not. *See Draftkings*, 650 F. Supp. 3d at 165 (allegations do not "clearly elucidate[] the boundaries of what, during the class period, was permitted and what was prohibited with respect to online gaming in general or, as specifically relevant to SBTech's business model, the licensing of gaming software.").

Second, and critically, beyond isolated and immaterial infractions addressed

11

below, Plaintiffs fail to plead that the Chinese government or local authorities share Plaintiffs' interpretation of the Double Reduction.  In fact, the *Cailian* Report, which Plaintiffs claim exposed TAL's scheme to teach its old curriculum under a different name in violation of the Double Reduction, was issued on March 14, 2023.  *See* Marino Decl. Ex. 6.  The Amended Complaint, filed five months later, does not allege *a single action* by the Chinese national government, or any local authority, in response to this purportedly major revelation.  Plaintiffs cannot plead that TAL knowingly or deliberately flouted Chinese regulations through its courses, much less ask this Court to support that interpretation, absent allegations that the authority that issued the regulations even believes they were breached.  *See In re Xunlei*, 2019 WL 4276607, at *10 ("[N]o entity with the force of law has found Xunlei's conduct illegal, rendering Plaintiffs' allegations purely speculative."); *Kauffman v. Nat. Health Trends Corp.,* 2019 WL 7165921, at *6 (C.D. Cal. Dec. 20, 2019) ("[T]aken together with the fact that Chinese regulators or lawmakers did not launch an investigation or determine that NHTC violated any laws, and that it was a news report, ***and not any actual finding of illegality***, which triggered this action, convinces the Court that any statements related to compliance with the Pyramid Law cannot form the basis for securities laws violations.") (emphasis added).  For the same reason, Plaintiffs fail to plead that TAL misrepresented the content of its enrichment classes with scienter (or at all).

Third, materials incorporated into the Amended Complaint highlight the absence of an authoritative interpretation of the Double Reduction, including in particular what constitutes "academic" and "non-academic" subjects. The *Cailian* Report itself explains that there is in fact no clear definition or instruction:

> Now, should Xueersi's instruction covering Chinese, math, and English, veiled under the cloak or mask of "humanism," "thinking," and "eloquence," be categorized as "academic tutoring," subject to stringent restrictions and non-profit purpose, or does it fall under the realm of "nonacademic tutoring," affording more operational latitude? This question **needs urgent clarification** and has become pivotal to the effect of the "double reduction" policy.

*See* Marino Decl. Ex. 6 (certified translation of foregoing paragraph) (emphasis added). The *Cailian* Report's acknowledgement of the ambiguity and uncertainty inherent in the Double Reduction belies Plaintiffs' claim that the "Cailian Report showed that TAL's enrichment classes were just academic courses." AC ¶ 14.

Fourth, Plaintiffs refer to certain "Identification Guidelines" issued by the Chinese government allegedly to indicate what is "***characteristic*** of academic tutoring," AC ¶ 125 (emphasis added). Plaintiffs' allegations illustrate further that what is "academic" is subject to various interpretations, and that enforcement is often left to local authorities, whose actions may not be uniform or predictable. *See, e.g.*, AC ¶ 139 (noting inspection by Zhonglou District Education Bureau); *id.* ¶ 140 (noting inspection by Honggutan District Education and Sports Bureau in Nanchang). Further, as alleged, the Identification Guidelines are ***guidance*** that a

13

tutoring company can use to try to predict how multiple disparate authorities might apply the Double Reduction. Plaintiffs do not allege that the Identification Guidelines are rules that govern what practices or courses violate the Double Reduction. As a result, Plaintiffs' allegations comparing TAL's practices to the Identification Guidelines have no significance because Plaintiffs nowhere plead that the authorities charged with enforcing the Double Reduction concur with Plaintiffs' litigation-inspired interpretation.

Regardless, Plaintiffs fail to plead with particularity that the Identification Guidelines suggest TAL breached the Double Reduction. Plaintiffs allege that "TAL's syllabi show that its classes consist of a series of lectures, or 'teaching demonstrations [] and interactions.'" AC ¶ 127. But Plaintiffs identify nothing in what they claim are TAL's syllabi that support this claim. The fact that each session is called a "lecture" is insignificant—that term can simply refer to a class session, or result from a clumsy translation—and Plaintiffs offer no verified translations for any of their materials. In any case, Plaintiffs fail to plead that the Double Reduction outlawed the basic system by which teachers convey information to students through lectures or "interactions" (which term is also not defined by Plaintiffs). And even assuming Plaintiffs' sources (whatever they are) are correct that TAL also assesses student progress, Plaintiffs fail to plead that providing feedback is banned by the Double Reduction. Notably, the consultant that Plaintiffs quote refers only to "an

14

evaluation to assess the child's learning process," AC ¶ 127,[1] which indicates at most that TAL seeks to determine how a particular child learns best.

Plaintiffs fail to plead with particularity what the Double Reduction prohibits, which means they fail to plead that TAL's courses and curricula breached its requirements or that Defendants knowingly or deliberately did so.

## C.    Plaintiffs Fail to Plead Any Individual Defendant's Knowledge of What the Double Reduction Prohibited

For similar reasons, Plaintiffs fail to plead any Defendant's actual knowledge of what the Double Reduction prohibited, much less what is considered "academic" or "non-academic."  To start, despite citing nine former employees and "internal documents," Plaintiffs allege no internal discussions or correspondence, and identify no documents reviewed by the Individual Defendants, that even suggest the Individual Defendants' understanding of the Double Reduction was contrary to their public statements or to TAL's curricula, or that they had knowledge of what material is taught at each grade level, and therefore what material would be deemed "too advanced" for certain students.  Plaintiffs' allegations that "Defendants had access to all course materials" and that "Zhang and Peng have separate executive permissions for all business groups," AC ¶ 180, are insufficient; merely being an

---

[1] Plaintiffs assert that TAL "continued to offer courses at three difficulty levels" and "screen[ed] [students] through evaluation and tests.'"  AC ¶ 128.  This shows, at most, that TAL determines who is prepared for what material—not what material TAL actually teaches once students enroll.

executive or having access to materials does not plead knowledge of contrary internal information (much less an understanding of the Double Reduction or its undefined terms). *See In re Draftkings*, 650 F. Supp. 3d at 178 ("[I]t is well established that a defendant's position does not, without more, support a conclusion that the defendant had access to information contradicting an alleged misrepresentation."); *In re Chembio Diag., Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 221 (E.D.N.Y. 2022) ("[P]leading access to information based on an individual defendant's executive position is insufficient to support an inference of scienter."); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 222 (S.D.N.Y. 2018) (dismissing complaint where "[t]here are no descriptions of when these reports would have been provided to the Executive Defendants").

The Company's robust disclosures are also inconsistent with intent to defraud investors. In particular, the Company warned expressly and repeatedly in its public filings that it might be unable to comply promptly, fully, or at all with all applicable regulations, and that such non-compliance could result in adverse actions. Indeed, having spent years in a highly-regulated industry with ever-evolving directives, the Company had been issuing similar warnings to investors for years. *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) ("It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures."), *aff'd sub*

16

*nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) ("transparency . . . further negates the inference of scienter").

### D.    Allegations Concerning a Handful of Infractions During the 15-Month Class Period Cannot Support Scienter

Plaintiffs allege that six localities cited TAL affiliates for a total of seven infractions during the 15-month Class Period (January 20, 2022 to March 23, 2023). *See* AC ¶¶ 134-140.  Notably, Plaintiffs allege that just *two* of these, at most, concern illicit teaching of "academic" subjects: that (i) the "Zhonglou District Education Bureau found that TAL violated the Double Reduction by offering academic tutoring," and that TAL received a Notice of Order to Correct and was told it would "receive further inspections," AC ¶ 139, and (ii) the Honggutan District Education and Sports Bureau in Nanchang, at some point in 2022, "found that TAL Education was teaching academic subjects in the guise of non-academic tutoring," and in January and February 2023 allegedly found "TAL was teaching a physics class in the guise of scientific literacy." *Id.* ¶ 140.  These allegations cite no documents—much less translations—from which Plaintiffs supposedly derived this information.

These limited allegations fail to support scienter for several reasons.  To start, Plaintiffs fail to allege that Defendants were aware of them.  A recent case dismissed similar allegations that TAL was responsible for, and supposedly aware of, a much wider array of pre-Double Reduction regulatory violations.  *See Sun v. TAL Educ.*

17

*Grp.*, 2023 WL 6394413, at *32 (S.D.N.Y. Sept. 29, 2023) (rejecting allegations that "'Defendants were aware of a vast number of violations'" because "it is unclear whether the Individual Defendants had access to information on these other violations" and "Plaintiffs point to no specific documents or reports that were accessed by the Individual Defendants."); *Frankfurt-Tr.*, 336 F. Supp. 3d at 222 (S.D.N.Y. 2018) (dismissing complaint where "[t]here are no descriptions of when these reports would have been provided to the Executive Defendants").

Plaintiffs also fail to allege that these limited infractions point to non-compliance beyond the alleged incidents. *See id.* at 224 (failing to plead alleged misconduct was so "'widespread' or done at such a scale that Defendants must have known about it."); *Karam v. Corinthian Colleges, Inc.*, 2012 WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) ("Plaintiffs have failed to allege particularized facts to show how many students and faculty members were involved in these alleged practices. Thus, we are unable to determine whether the alleged problems were of a sufficient magnitude to render misleading Defendants' statements regarding their commitment to regulatory compliance.").

Further, Plaintiffs allege no material impact on TAL or its business from any of the alleged infractions incurred at TAL affiliates—much less the two that allegedly concerned illicit tutoring topics—nor, despite Plaintiffs' artful pleading, that **TAL itself** was cited. Nor do Plaintiffs allege what specific subjects or skills

18

(beyond "physics") were being taught, nor *why* the courses at issue constituted "academic" and not "enrichment" learning, what curriculum was in use, or, critically, what standard the specific locality applied in making its determination.

Notably, in connection with the second alleged violation, Plaintiffs claim that "[t]he inspectors . . . warned TAL that if it violated the Double Reduction again, its tutoring license would be revoked."  AC ¶ 140.  But Plaintiffs nowhere allege that either instance did, or could, affect TAL beyond the local school that is subject to the local district bureau's jurisdiction.  Nor do Plaintiffs allege that the local TAL school actually lost its license, despite the intensive monitoring, spot-checks, and inspection regime to which TAL and its affiliates were allegedly subject.  *See supra* Background § B.  The most plausible inference is that the relevant locality incurred no more violations, which further illustrates Plaintiffs' failure to allege knowing or willful compliance failures.  *See Kauffman*, 2019 WL 7165921, at *6 (finding media report insufficient to allege that company's statements concerning legal compliance were false where Chinese government itself did not act).

### E.      Plaintiffs Fail to Attribute Knowledge to Former Employees With Sufficient Particularity

Under this Court's standards for particularity, none of Plaintiffs' cited former employees (FE 1 through FE 9, and each an "FE") is pleaded sufficiently to support the allegations attributed to them, and therefore also fail to support scienter.

Plaintiffs must allege not only "the time during which the confidential

19

witnesses worked at the company and their titles," but also "the dates when the material information was acquired and descriptions sufficiently particular to show how the witness would have access to the information at issue." *New Oriental*, 2019 WL 2865452, at *9 (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004)).  Although Plaintiffs allege (for the most part) each FE's general dates of work and job titles, they offer "[n]o details" as to "how or when a confidential witness learned of the information he or she provides," nor even "if the information comes from first-hand knowledge." *New Oriental*, 2019 WL 2865452, at *10; *see also id.* at *11 ("Nor do the statements by [confidential witnesses] regarding their own practices meet the pleading standard because, in addition to not working for New Oriental during the class period, the 'who, what, when, where, and how' of the allegations is lacking.").  Further, the Amended Complaint (with limited exceptions) "does not directly quote statements from these confidential witnesses; each allegation begins with 'according to.'" *Id.* at *10; *see, e.g.*, AC ¶¶ 169-170 ("According to FE 1 and FE 5"); *id.* ¶ 175 ("According to FE 2"); *id.* ¶ 94 ("according to FE 3"); *id.* ¶ 172 ("According to FE 6"); *id.* ¶¶ 171 ("According to FE 7, FE 8, and FE 9").

Further, although absence of "personal interaction" with the Individual Defendants does not by itself disqualify the FEs, Plaintiffs must—but do not— "describe the nature of the [FEs'] contact with the individual defendants that would

20

be probative of defendants' mental state." *TAL Educ. Grp.*, 2023 WL 6394413, at *31 (internal citation omitted).[2]  And, regardless, even if the FEs could establish that TAL's syllabi were uniform across their teaching centers, as noted above they have failed to establish those syllabi or any other allegations support a breach of the Double Reduction, or scienter.

The sole FE-related quotation concerning the content of TAL's courses is attributed to FE 4, who allegedly confirmed that TAL's *Humanistic Creation* course is merely "'Chinese, reading and writing.'"  AC ¶ 121.  But Plaintiffs quote just those four words, and not the basis for the purported "confirmation."  Further, Plaintiffs allege only that FE 4 was a "course consultant" between an undetermined point in 2022 and May 2023, and do not allege FE 4's duties or responsibilities, the specific courses on which FE 4 supposedly consulted, or how FE 4 was positioned to know the content of *any* of TAL's courses.  The allegations attributed to FE 4 are therefore insufficiently particular.  *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (must describe witnesses "with sufficient particularity to support the probability that a person in the position occupied by [the witness] would possess the information alleged.").

---

[2] That Plaintiffs cite nine FEs does not cure these deficiencies.  *See New Oriental*, 2019 WL 2865452, at *7 (a "litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA") (quoting *Chubb*, 394 F.3d at 155).

**F.      The Non-Fraudulent Inference is the Sole Plausible Inference**

The inference that the Individual Defendants knowingly and/or intentionally misrepresented and concealed TAL's operations is neither strong nor nearly as compelling as the non-fraudulent inference that TAL sought to navigate a new regime that Plaintiffs' own source calls "bewildering." *See supra* Argument § I.B.

Plaintiffs' thesis is implausible. They allege that TAL engaged in a Company-wide conspiracy, involving hundreds of service centers and thousands of people, to conceal that TAL entirely disregarded the Double Reduction's seismic change to TAL's industry. Apparently, TAL—the leading tutoring Company in China before the Double Reduction—expected to escape the notice of authorities despite *advertising* its supposedly illegal courses and openly promoting them to countless parents and students. And TAL did this knowing "the Double Reduction also implemented ***monitoring requirements to ensure compliance***," AC ¶ 73 (emphasis added), that its business would be subject to "spot checks" and other inspections by local and other authorities, and that the MOE "listed the Double Reduction as one of its top priorities for 2022," *id.* ¶ 183.[3] Further, Plaintiffs fail to allege that TAL made any effort—beyond an average of less than one alleged misstatement per month

---

[3] Plaintiffs' assertion that "[n]on-academic subject training materials were subject only to spot checks by local government" is contrary to the quote following this assertion, which refers to "spot checks and inspections." AC ¶ 79. Nor does the quote say that "spot checks and inspections" were the ***sole*** forms of enforcement.

22

during the 15-month Class Period—to conceal its sprawling operations, and not a single FE describes any such action.  In other words, TAL's alleged conduct is completely inconsistent with seeking to conceal alleged massive lawbreaking.

The sole plausible inference is therefore that TAL, as disclosed, made consistent efforts to comply with Double Reduction policy directives, which are subject to various interpretations, and incurred sporadic, isolated, and immaterial infractions issued by a few local enforcement agencies.

## II.    PLAINTIFFS FAIL TO ALLEGE ACTIONABLE MISSTATEMENTS

Allegations of securities fraud must "specify the who, what, when, where, and how: the first paragraph of any newspaper story." *Chubb*, 394 F.3d at 144 (quotation omitted); *see also* Fed R. Civ. P. 9(b).  Under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  But here, Plaintiffs seek to support their claims with a handful of unauthoritative media reports and a single, unverified syllabus attached as Exhibit A, which is insufficient to plead that Defendants falsely represented their efforts to comply with the Double Reduction.

### A.    TAL's Warning Language Precludes Plaintiffs' Falsity and Materiality Claims

TAL's statements concerning its tutoring and business model are not misleading in the context of the Company's warnings concerning the uncertainties of the Chinese regulatory landscape and application of the post-Double Reduction

23

guidelines. *See supra* Background § C; *see also* **Statement #1**[4] ("The Company will continue . . . with its efforts to comply with the policy directives in the Opinion and any related implementation rules, regulations and measures."); **Statements #5, #12** ("Due to the complexity and substantial uncertainty of the regulatory environment, we cannot assure you that our operations would be in full compliance with applicable laws, regulations and policies, including the [Double Reduction] and its implementation measures, in a timely manner, or at all.").

Plaintiffs do not even allege material government actions in the wake of the *Cailian* Report, but the possibility of such adverse actions arising from non-compliance with the Double Reduction was nonetheless repeatedly disclosed. *See Sandoz v. Waterdrop, Inc.*, 2023 WL 1767526, at *10 (S.D.N.Y. Feb. 3, 2023) (statements by Chinese company that it faced "'uncertainties relating to the change in regulatory regime'" and warned it "cannot ensure that it will be able to comply with new regulations in a timely manner" sufficiently "notified investors of the risks stemming from the regulatory environment."); *Africa v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *7 (S.D.N.Y. Sept. 28, 2022) ("These statements, however, are not misleading for two reasons. First, as described above, Jianpu explicitly disclosed such risks in its Prospectus."); *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 675 (N.D. Tex. 2022) ("[N]o reasonable investor would understand Range's hedged

---

[4] Statements set forth in Appendix A are rendered as "**Statement # __**".

and qualified statement as a guarantee of absolute compliance with the law.").[5]  And, notably, Plaintiffs allege that a "Media Campaign Called Attention To Academic Courses Disguised As Enrichment Learning," AC at p. 56, so any alleged possibility that TAL and other tutoring companies had breached the Double Reduction was already public information, also rendering immaterial any alleged misstatements alleged during or after that campaign.  *See In re Qudian Inc. Secs. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) ("[I]t is well established that an alleged misstatement does not qualify as material if the relevant facts are 'already in the mix of public information' at the time of an IPO.").

### B.   Plaintiffs' Scattered, Unverified Allegations Concerning TAL's Curricula Do Not Establish Falsity

Much of the Amended Complaint relies upon one-off assertions concerning TAL's courses or TAL's comments about its course offerings, or upon comparing TAL's courses to its pre-Double Reduction offerings or to the MOE general curricular objectives, and arguing that any overlap constitutes a breach of the Double

---

[5] Plaintiffs also plead that "around June 30, 2022, the Beijing Municipal Administration of Culture and Tourism revealed that it had fined TAL for publishing and disseminating prohibited content . . . apparently referring to materials that had not gone through the approval procedures required of academic tutoring materials." AC ¶ 137.  But Plaintiffs nowhere plead *facts* that support their speculation about the reason for this alleged fine.  Similarly, Plaintiffs plead that certain schools were "unqualified," but do not plead the basis for this either, asserting instead that their source material (which they do not identify) speculated that "possible failures included providing subject-matter training in the guise of non-academic training." AC ¶ 138.  Multi-layered speculation cannot plead falsity with particularity.

Reduction. As detailed above, Plaintiffs have failed to plead with particularity what the Double Reduction prohibits; their falsity allegations fail for the same reason, and because Plaintiffs fail to make meaningful comparisons among the alleged curricula.

### 1. Plaintiffs' Allegations Concerning Curricula Do Not Support Falsity With Particularity

To start, Plaintiffs allege that TAL "offered Science & Creativity, Coding & Programming, and Humanities & Aesthetics classes at multiple difficulty levels for each grade," but that "at each grade level" TAL "taught the same or similar subject matter," and did not "offer separate science classes in astronomy, dinosaurs, or micro-organisms, or other subjects designed to appeal to students' individual interests." AC ¶ 94. Plaintiffs nowhere allege why TAL's courses did not appeal to students' interests (nor why micro-organisms would), nor in particular that TAL breached the Double Reduction by allegedly failing to tailor its curricula to every individual student. And Plaintiffs allege no reason TAL should not tailor its material to specific grades—kindergartners are not prepared for eighth grade subjects.

Plaintiffs' allegation that TAL "boasted that questions it had posed to students in its classes were very similar to questions that appeared in school tests," AC ¶ 97, likewise alleges, at best, that TAL claims its classes help kids do well in school and potentially a modicum of overlap among school and TAL-based curricula, but says nothing—and certainly nothing particularized—about TAL's full course offerings.

Plaintiffs allege that TAL's teaching methods include lectures, exams, and

26

homework, which methods are also noted in the Identification Guidelines. AC ¶ 98. As discussed above, Plaintiffs' interpretation of the Identification Guidelines is not meaningful, given the absence of a concurring interpretation from the Chinese government. *See supra* Argument I.B. And Plaintiffs nowhere allege that the Double Reduction *per se* forbade TAL from utilizing any of these. Notably, Plaintiffs themselves allege that at least one TAL class was taught in an "escape room" format, which differs dramatically from traditional teaching. AC ¶ 184.

Plaintiffs' attempt to interpret TAL syllabi—without any indication of a reliable translation—also fails to support falsity with particularity. Plaintiffs allege that two Grade 3 syllabi for TAL were posted to a Chinese social-media site called Weibo on May 5, 2022. AC ¶ 101. These syllabi were allegedly for "math classes," and Plaintiffs identified a *single math problem*—the "tree planting problem"—that allegedly overlaps with certain school curricula. *Id.* ¶ 103. Plaintiffs state that TAL's curricula include "lectures" (without reliable translation), but allege no detail as to the approach to, or content of, the subject matter within the lectures, nor plead that simply referring to "math" is forbidden by the Double Reduction. And the supposedly incriminating syllabi were posted to Weibo **months** before the Amended Complaint was filed, yet Plaintiffs do not allege the Chinese government cited them as breaches of the Double Reduction—which strongly suggests they are not.

Plaintiffs attach just one purported TAL syllabus to their Complaint, Exhibit

27

A, which fails to support falsity with particularity. To start, Plaintiffs do not substantiate its translation. Further, the document bears no date, and so there is no way to determine if it describes pre- or post-Double Reduction classes. Nor does it include the title of the course, or even indicate it was issued *by TAL*. Exhibit A is insufficiently pleaded to support any of Plaintiffs' claims.

Even if Exhibit A were a current TAL syllabus, it would not support falsity. Exhibit A describes the broad aim of an entire class in a sentence or sentence fragments, with no detail on teaching, content, or pedagogical approach. If anything, Exhibit A conveys that the classes emphasize such universal skills as "critical thinking," "[t]hinking orderly," "problem-solving," "[l]ogical analysis," and "clever" approaches to concepts, and the "Topics" covered include "Endless trees," "Colorful lights," and "Animal adventure"—none of which Plaintiffs allege were in TAL's pre-Double Reduction syllabi or appear on the list of MOE objectives. Indeed, beyond claiming the syllabus includes certain aspects of "math"—an overlap Plaintiffs also fail to plead is prohibited by the Double Reduction—Exhibit A fails to support with any particularity Plaintiffs' broad accusations that TAL did nothing more than rename its courses.

Plaintiffs also allege that Exhibit A is "strikingly similar to TAL's actual math classes" and "virtually identical" to TAL's "Think Academy" courses taught outside mainland China (where TAL is permitted to teach "academic" subjects). AC ¶ 105.

28

The Complaint also compares Exhibit A to a purported Grade 3 syllabus for "Think University" (Plaintiffs do not clarify if "Think University" and "Think Academy" are the same).  *See id.*  Notably, Plaintiffs claim the "core knowledge" goal of the first summer lecture on Exhibit A is to "[c]alculate the perimeter problem, cultivate graphic cognition and logical analysis ability."  AC ¶ 105(c).  But that is wrong.  The description of "Summer Lecture Session 1" on Exhibit A is, in fact, "Cleverly solve the perimeter problem, cultivate graphic cognition and logical analysis ability."  That differs materially from the Think Academy/University description "understand the meaning of perimeter in life, and use some tools and apply them to perimeter estimation."  *Id.*  Indeed, the sole overlap is the "perimeter," which concept Plaintiffs nowhere allege is now forbidden.  And Plaintiffs' self-serving suggestion that TAL's "*Creative Thinking*" course could adhere to the Double Reduction only if it were a course on "history of mathematics" or "famous mathematicians" again finds no support in the regulations to the extent alleged.  AC ¶ 105(d).

Plaintiffs' additional attempts to compare syllabi are likewise deficient. Plaintiffs allege generally that "TAL's enrichment classes are strikingly similar to its pre-Double Reduction classes" on the basis of "internal TAL documents" that allegedly included "textbooks for TAL's grade 3 math classes."  AC ¶ 106. Plaintiffs then allege that "TAL's pre-Double Reduction Grade 3 class taught the same materials as its Grade 3 Creative Thinking classes," without specifying whether this

29

conclusion arises from comparing syllabi or textbooks (or whether TAL's current enrichment classes even use textbooks), or from other unidentified "internal documents," or otherwise. *See id.* Plaintiffs' allegations that both the pre- and post-Double Reduction classes included "classes on" a list of topics again fails to cite any source or basis for the comparison, or verifiable translation. And Plaintiffs fail to allege that the bare overlap of certain similar concepts means the classes were *identical*, nor again any facts suggesting the Double Reduction prohibits all overlap. Notably, the last example of overlap in the list in Paragraph 106 is "[c]alculating perimeters and the area of a shape"—as described above, this does not suggest identity with the syllabus in Exhibit A.[6] *See also* AC ¶ 108 (making tenuous comparisons between vague and overbroad MOE objectives—which is *not* a syllabus—and Exhibit A).

Plaintiffs also allege that, for instance, "TAL's Grade 3 *Creative Thinking* enrichment classes collectively taught the same concepts as the [MOE's] Grade 3-4 math requirements," and that the syllabi were "nearly identical" to "TAL's pre-Double Reduction classes on the same subject and at the same grade level," and that TAL students who took Grade 3 math classes in the U.S. learn substantially the same

---

[6] Plaintiffs allege that "[s]hort excerpts of TAL's pre-Double Reduction classes were also posted online by a third party," AC ¶ 107, but offer no video excerpts of TAL's post-Double Reduction classes for comparison. Nor do Plaintiffs offer any translation or other substantiation of the content of the referenced videos.

30

things as TAL students who took Grade 3 *Creative Thinking* in China." AC ¶ 96. Again, Plaintiffs offer no translation or verification of these materials, nor any way to evaluate this conclusory assertion. And, as above, Plaintiffs' allegations that Exhibit A is highly similar to the curricula for Think Academy/University are demonstrably incorrect, and there is no reason to believe that Plaintiffs' allegations about syllabi Plaintiffs have ***not*** attached are any more reliable.

Plaintiffs' allegations about TAL's *Humanistic Thinking* class also fail to support falsity with particularity, much less Plaintiffs' theory that TAL simply renamed the same courses. For instance, Plaintiffs allege that one quarter of the MOE objective comprises "Pinyin," or "the standard transliteration of Chinese characters into Roman letters." AC ¶ 109.[7] Plaintiffs further allege that TAL's classes "would include 10 minutes of Pinyin education," *id.*, without alleging the total portion of the curriculum Pinyin would occupy. And, again, Plaintiffs nowhere allege TAL took the same pedagogical approach, nor even where the Double Reduction defines "Pinyin" as "academic" or prohibits it.[8] *See also* AC ¶ 117

---

[7] Although the Court need not reach this issue, the syllabi and promotional materials alleged in Paragraphs 111-116 and 124 of the Amended Complaint do not match TAL's official materials, and their origin is therefore unclear.

[8] Plaintiffs allege that TAL offered "4 free classes to help manage the transition between kindergarten and first grade," which "would 'improve literacy', teach students reading and writing, and develop their reading skills," and that "[t]hese are the skills at the heart of the MOE Curriculum Guide's critical goals for Grade 1." AC ¶ 115. But these skills are the heart of most learning, and Plaintiffs do not allege the Double Reduction broadly prohibits enhancing fundamental skills.

(alleging, without verification or translation, and without alleging the pedagogical approach or skills emphasized, or even that the words are the same, that TAL and the MOE sought to build a child's vocabulary); AC ¶¶ 118-120 (alleging TAL's syllabus addressed three out of *fifty* poems on the MOE Grade 1-2 objectives).

At the very most, Plaintiffs allege that the subject matter in TAL's enrichment classes, and the subject matter in TAL's pre-Double Reduction classes and/or the topics on the MOE objectives, were not completely free of overlap—*i.e.* TAL did not exclusively teach "dinosaurs" or "famous mathematicians"—without allegations suggesting that any overlap at all is prohibited by the Double Reduction. Plaintiffs therefore fail to plead with particularity that TAL's statements relating to its enrichment courses, or attempts to comply with the Double Reduction, were false.

### 2. Plaintiffs' Allegations Concerning TAL Promotional Materials and Want-Ads Do Not Support Falsity

Plaintiffs' allegations concerning TAL's promotional materials do not support falsity. Plaintiffs claim that TAL's advertising suggests it will help children succeed in school, without asserting that the Double Reduction prohibits TAL from providing such assistance. *See, e.g.*, AC ¶ 124. Nor do Plaintiffs allege that teaching such skills as problem-solving and critical thinking would not help students succeed.

Plaintiffs also point to another portion of the *Cailian* Report—for which, again, Plaintiffs offer no translation and little detail—that allegedly published "three TAL promotional pamphlets." *Id.* The first concerned a second-grade class and

32

allegedly displayed "two boxes," the first titled "What the school tests" and the second titled "what we are learning." *Id.* Plaintiffs claim "[t]he boxes have similar, if not identical, contents." *Id.* But Plaintiffs nowhere allege what the contents of either box actually ***are***, nor that the pamphlet claims to teach "academic" subjects, as opposed to such skills as "logic" or "problem solving." Indeed, Plaintiffs fail to plead that the pamphlet is anything more than advertising puffery.

Further, Plaintiffs do ***not*** allege that the other two pamphlets claim to teach academic subjects, but only to "help students answer 'common classic question types in school-specific supplement questions," *id.*, and to develop "ordered enumeration and data processing skills, and to describe similar word problems," *id.* Plaintiffs do not allege that teaching basic skills to assist in the learning process is "academic," nor that TAL is forbidden from teaching problem-solving and data processing. Regardless, Plaintiffs do not allege that the pamphlets, even if they evidenced a breach of the Double Reduction's policy directives, were approved by the Individual Defendants, or otherwise suffice to allege any systematic non-compliance. Indeed, although Plaintiffs' FEs claim that "promotional materials . . . were created and overseen by the regional headquarters or TAL's centralized divisions," AC ¶ 169, these general statements about operations fail to plead support for the origin of these pamphlets—for instance, that they resembled typical TAL materials (beyond including an easily-duplicated logo), or used language typical of TAL—nor do the

33

FE's broad pronouncements allege with particularity that local schools nonetheless did not issue unauthorized materials.  Plaintiffs supply no facts with which to match unparticularized and largely unquoted FE statements with specific materials at issue.

Plaintiffs also cite purported TAL want-ads for teachers, but nowhere allege the ads were written or approved by the Individual Defendants, as they clearly varied from region to region.  AC ¶¶ 130-131.  Further, that TAL sought teachers with specific skills or training does not indicate (much less with particularity) that those teachers taught prohibited subjects.  Nor would it make sense for TAL to hire teachers to teach logic or problem-solving who lacked basic grounding in math or Chinese.[9]  That TAL's teachers might be *qualified* to teach certain subjects does not mean—much less allege with particularity—that they *did* teach them.

### C.    The Handful of Alleged Infractions Does Not Render False TAL's Statements About Its Revised Curricula

Plaintiffs' assertion of a handful of infractions over a 15-month Class Period, only two of which allegedly concern teaching of "academic" subjects, fails to support falsity.  Courts have repeatedly held that limited breaches across a large operation do not render false general statements about compliance.  *See Africa v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *6 (S.D.N.Y. Sept. 28, 2022) ("At best,

---

[9] Plaintiffs also claim that "an educational industry professional . . . wrote that Xueersi 'closely follow[] the school's curriculum," but Plaintiffs illustrate this claim with a single screenshot of a parallelogram.  AC ¶ 133.  Again, Plaintiffs' allegations fall well short of establishing systematic rule-breaking with particularity.

Africa alleges that a few loan providers on Jianpu's platform did not comply with regulations regarding interest rates.  With no showing of falsity, Africa's claim for securities fraud on the basis of these statements must fail."); *In re Tenet Healthcare Corp. Sec. Litig.*, 2017 WL 11638941, at \*4 (N.D. Tex. Dec. 20, 2017) ("No compliance efforts will ever be 100 percent effective at detecting or stopping all bad conduct inside a large company . . . ."); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 634 (S.D. Tex. 2018) ("The regulatory violations on pipelines other than Lines 901 and 903 . . . do not make Plains's opinion statements about substantial compliance false or misleading.").

Similarly, a handful of incidents is insufficient to plead widespread violations, much less that TAL had simply renamed its courses and continued to teach the same, pre-Double Reduction curriculum.  *See Karam*, 2012 WL 8499135, at \*7 ("These statements also fail to support Plaintiffs' allegations of widespread misconduct because none of them purports to quantify the total number of students affected by the alleged improper practices."); *Boca Raton Firefighters' and Police Pension Fund v. Devry Inc.*, 2012 WL 1030474, at \*4 (N.D. Ill. Mar. 27, 2021) ("Even concrete allegations of wrongdoing may be deficient if they do not allege a problem of sufficient magnitude to undermine the defendants' public statements about DeVry's policies and practices.").  Plaintiffs' scattered infractions across TAL's entire operation—and just a pair of allegations concerning purportedly "academic"

35

courses—do not come close to pleading that TAL's statements about overall compliance and its coursework were somehow false.

###   D.    Plaintiffs Fail To Plead Falsity for Additional, Statement-Specific Reasons

**Statements #2, #3, #7, #9, #13**.  Plaintiffs fail to plead that these statements misrepresented the content of TAL's course offerings.  Indeed, these statements did nothing more than describe TAL's enrichment courses, such as that "[s]cience and creativity guides learners through observation, analysis, and application of various scientific phenomena and theories" (**#2**) or "[i]n addition to our current programs covering science and creativity, coding and programming, and humanity and aesthetics, we also wrote out new programs such as international chess, rhetoric, and natural science learning" (**#7**).  Plaintiffs fail to plead that TAL's courses ***do not*** cover these topics, and offer no syllabi or other materials to support that assertion.  Plaintiffs' claim that "enrichment" itself was misleading (**#9, #13**) because TAL continued to teach the same courses is insufficiently pleaded for the reasons addressed above, *see supra* Argument §§ I.B. & II.B.

Further, statements that describe generally TAL's characterizations or hopes for the future, such as creating "well-rounded people and lifelong learners" (**#2**), that "classes typically will foster a lot more interaction" (**#3**), that TAL was focusing on "finding the right learning processes and user journeys" (**#9**), and that TAL is a "believer of enrichment learning and all-around development" (**#13**), are nowhere

36

pleaded to be false or faulty descriptions of TAL's courses or mission, and regardless are routinely dismissed as puffery under the securities laws, particularly in the education context.  *See, e.g.*, *In re ITT Educ. Svc., Inc. v. Sec. and S'holder Deriv. Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) ("single internal focus continues to be on maximizing students' success" was "typical corporate puffery" and "precisely the type of vague, boilerplate pronouncement[] that no reasonable investor would substantially rely upon when evaluating a company."); *Okla. Firefighters Pension and Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1081 (D. Minn. 2012) (statement that Capella's approach "validate[s] our strategy to focus on our learners, educational quality and excellence" were "obvious hyperbole and corporate cheerleading"); *Kemp v. Univ. Am. Fin. Corp.*, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007) ("If general statements made by companies touting quality customer service . . . were actionable, a never-ending tide of securities lawsuits would flood the courts.").

**Statements #8, #10**.  Plaintiffs take issue with TAL's references to its "viable" and "healthy" business model.  First, as above, Plaintiffs' fail to allege that TAL's business was not "viable" and "healthy," given the failure to allege material consequences from any alleged infractions.  By contrast, Plaintiffs ***plead*** that TAL's new business "far exceeded analysts' expectations."  AC ¶ 90.

Second, both are inactionable statements of opinion: each is introduced by

37

"[w]e believe" and expresses hope for the future. To plead an opinion is "false," Plaintiffs must allege that (i) the statements were both objectively false and subjectively false (*i.e.*, not genuinely believed at the time they were made), *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-186 (2015), or (ii) that the defendant omitted material facts underlying the basis for the opinion and those facts conflict with what a reasonable investor would take from the statement itself. *Id.* at 189.

As noted above, Plaintiffs plead that TAL was *beating* analyst projections and fail to plead any government crackdown—meaning the alleged facts support TAL's view that its business was healthy. For this reason, even if Plaintiffs had alleged that the Individual Defendants were aware of overlap between pre- and post-Double Reduction curricula, they would fail to plead that Defendants did not honestly believe the business was sufficiently compliant to remain healthy—which, again, is exactly what Plaintiffs allege has happened. *See Omnicare*, 575 U.S. at 189-90 (speaker's knowledge of "some fact cutting the other way"—that is, against the speaker's view—"is not necessarily misleading" because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts."); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 754 (S.D.N.Y. 2018) (insufficient "to allege that an opinion was unreasonable, irrational, [or] excessively optimistic."); *see also Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at *9 (N.D. Cal. Apr.

38

7, 2021) ("Plaintiff has alleged that Baidu has a history of investigations and sanctions by Chinese regulators.  However, as to subjective falsity, Plaintiff has not alleged specific facts that suggest that, at the time of the 2018 and 2019 Annual Reports, Baidu did not believe its own counsel's legal opinion that it was in compliance with Chinese regulations.").[10]

These Statements, too, are not "sufficiently specific for an investor to reasonably rely on . . . as a guarantee of some concrete fact or outcome."  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  Similar statements about business health and viability are routinely dismissed as puffery.  *See e.g.*, *Jianpu Tech.*, 2022 WL 4537973, at *7 ("anticipating 'growth for the rest of the year' was a "general statement[], evincing corporate optimism, rather than [a] specific or material statement[].");  *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 211 (S.D.N.Y. 2020) ("healthy growth" was puffery); *In re Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1010 (D. Minn. 2006) ("we have built a fundamentally sound business that is clearly poised for continued profitability"); *Auctus Fund, LLC v. NuGene Int'l, Inc.*, 2021 WL 1069462, at *6 (D. Mass. Mar. 19, 2021) ("growth potential is limitless").  And, as noted above, Plaintiffs actually

---

[10] **Statements #4** and **#11** are Form 20-F certifications attesting to the truth of the information in the Forms 20-F for fiscal years 2021 and 2022, respectively. Because Plaintiffs fail to allege that the Forms 20-F contained misstatements, Plaintiffs fail to plead that these two Statements were materially false.

allege facts suggesting that TAL's business was thriving, and allege not a single material impact on that business based on any supposed regulatory breaches.[11]

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint, in its entirety, with prejudice.

DATED: New York, New York
           December 15, 2023

Respectfully submitted,

**MARINO, TORTORELLA**
**& BOYLE, P.C.**

Kevin H. Marino
John D. Tortorella
437 Southern Boulevard
Chatham, NJ 07928-1488
Telephone: (973) 824-9300
Facsimile: (973) 824-8425
kmarino@khmarino.com
jtortorella@khmarino.com

Michael B. Carlinsky[†]
Xiao Liu[†]
Jacob J. Waldman[†]
**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601

---

[11] To sustain their Section 20(a) claim, Plaintiffs must plead, among other things, a primary violation of Section 10(b).  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).  Plaintiffs' failure to plead a violation of Section 10(b) means their Section 20(a) claim likewise fails.

[†] Application for admission *pro hac vice* forthcoming.

40

Telephone:  (212) 849-7000
michaelcarlinsky@quinnemanuel.com
xiaoliu@quinnemanuel.com
jacobwaldman@quinnemanuel.com
jianjianye@quinnemanuel.com

41

*Lewandowski v. TAL Education Group et al.*, No. 2:23-cv-01769-MEF-JRA (D.N.J.)

**Appendix A - Chart of Alleged Misstatements**[1]

| # | ¶¶ | Date | Source | Statement |
|---|-----|------|--------|-----------|
| 1 | 144 | 2022-01-14 | 6-K | On November 12, 2021, the Company issued a press release to announce that in response to the regulatory developments relating to after-school tutoring services, including the Opinions on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education, published in July 2021 by the General Office of the CPC Central Committee and the General Office of the State Council (the "Opinion" [i.e., the Double Reduction]) and the related implementation rules, regulations and measures promulgated by competent authorities, the Company decided to cease offering academic subjects to students from kindergarten through grade nine ("K9 Academic AST Services") in the mainland of China by the end of December 2021.<br><br>***The Company has completed the cessation by the due date*** and expects that the cessation will have a substantial adverse impact on the Company's revenues for the fiscal year ending February 28, 2022 and subsequent periods. In the fiscal year ended February 28, 2021, the revenues from offering K9 Academic AST Services accounted for a substantial majority of the Company's total revenues in the year. By leveraging its leading-edge education technology, high quality content and extensive experience, the Company will continue to operate and develop the portion of its business that is not related to K9 Academic AST Services, and will also explore other opportunities to provide education services in accordance with relevant rules and regulations. ***The Company will continue to seek guidance from and cooperate with government authorities in various provinces and*** |

---

[1] Paragraph references are to the Amended Complaint.  All text in the "Statement" column is from the Amended Complaint, including any bolding or italics.

1

| # | ¶¶ | Date | Source | Statement |
|---|---|---|---|---|
| | | | | *municipalities in China in connection with its efforts to comply with the policy directives in the Opinion and any related implementation rules, regulations and measures.* The Company will further adjust its business operations as required, and update its shareholders as appropriate. |
| 2 | 146 | 2022-04-29 | Earnings call | Let me now spend some time to talk about the programs themselves. *Science and creativity guides learners through observation, analysis, and application of various scientific phenomena and theories. The program is designed to develop learners' scientific curiosity and problem-solving capabilities.* Coding and programming covers a broad range of computer science-related topics, including programming literacy, software development, algorithm, and et cetera. The program is designed to advance learners technological fluency and critical thinking skills. *Humanities and aesthetics provide comprehensive learning at the intersection of history, art, and literature. The program is designed to cultivate learners' cultural and aesthetic literacy.* Aside from the offerings mentioned above, we are actively developing additional programs. *We have witnessed demand from our customers to develop as well-rounded people and lifelong learners. Our enrichment programs are designed to capture that demand.* Enrichment learning will continue to be an important pillar in our business going forward. |
| 3 | 147 | 2022-04-29 | Earnings call | Q: Good evening, and thank you management for taking my question. And congratulations on turning profitable in a very challenging environment. My question is on your transition |

| # | ¶¶ | Date | Source | Statement |
|---|----|------|--------|-----------|
| | | | | towards the non-academic tutoring. So could you share a bit more color on the transition more typically were coming from the typical angle after-school tutoring. So, what level of enrollments are we looking at? Any retention rate to share, and the margin outlook for the non-academic tutoring? DEFENDANT PENG: Great. Thanks Felix. Another great question. Let me first recap a little bit what Jackson talked about before. So to start with**, the enrichment learning services, in terms of the subjects areas, are very different from academic after-school tutoring and services**, but the business model, if you look at that type of business model, it's somewhat similar to that of academic AST. ***The product format is different. I mentioned the content format is different.*** We provide enrichment learning services in both online and offline formats in various class sizes. And we're also observing some interesting—yeah, we're making some interesting observations, that ***these kinds of classes typical will foster a lot more interaction, a lot more student-driven activity, and we absolutely look forward to continue to innovate and optimize those offerings to our customers and their operations.*** For sure, we're closely tracking the metrics that reflect the overall health and growth of the business. So we can continue to fine-tune the business model. So, I think it's really still too early to discuss the metrics themselves, but we'll come back to you as soon as possible. Thanks. |
| 4 | 149 | 2022-06-14 | 20-F | I have reviewed this annual report on Form 20-F of TAL Education Group [] Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; |

3

| # | ¶¶ | Date | Source | Statement |
|---|---|---|---|---|
| 5 | 150 | 2022-06-14 | 20-F | We have been closely monitoring the evolving regulatory environment and are making efforts to seek guidance from and cooperate with the government authorities to comply with the Alleviating Burden Opinion and its implementation measures. ***In compliance with the Alleviating Burden Opinion Regarding Compulsory Education and applicable rules, regulations and measures, we ceased offering K9 Academic AST Services in mainland China by the end of December 2021***. Such cessation has had a significant negative impact on our financial performance for the fiscal year ended February 28, 2022 since revenues from offering K9 Academic AST Services accounted for a substantial majority of our total revenues prior to our cessation of such business, and is expected to have a significant negative impact on our financial performance for the fiscal year ending February 28, 2023 and subsequent periods, compared with that of previous years***. Due to the complexity and substantial uncertainty of the regulatory environment, we cannot assure you that our operations would be in full compliance with applicable laws, regulations and policies, including the Alleviating Burden Opinion and its implementation measures, in a timely manner, or at all.*** |
| 6 | 152 | 2022-06-14 | 20-F | **Learning Services** *We are currently offering, and evaluating, a broad range of learning programs that are aligned with our mission, core competencies, and learner demand.* We deliver our learning services primarily through small classes, personalized premium services and online course offerings.<br><br>We launched our ***enrichment learning*** programs in recent years, such as ***Science and Creativity***, Coding and Programing, and ***Humanities and Aesthetics***. Equipped with our robust ***content development*** and technology capabilities, we are devoted to creating immersive, engaging, and holistic learning experiences to learners. ***We have designed and implemented a leveled learning program for learners of different ages and differed interests.*** In addition to the enrichment learning programs, we are continually providing |

4

| # | ¶¶ | Date | Source | Statement |
|---|---|---|---|---|
| | | | | academic tutoring services under the guidance from local government authorities in various provinces, municipalities and countries. Historically, we offered K9 Academic AST Services in mainland China, **which was ceased at the end of 2021 in compliance with regulatory policies promulgated in 2021.** The revenues from offering K9 Academic AST Services accounted for a substantial majority of our total revenues in the fiscal year 2021 and 2022.<br><br>Our primary **enrichment learning** offerings currently include following programs:<br><br>• Science and Creativity guides learners through observation, analysis and application of various scientific phenomena and theories. The program is designed to develop learners' scientific curiosity and problem-solving capabilities.<br><br>• *Coding and Programing* covers a broad range of computer-science related topics, including programing literacy, software development, algorithms and others. The program is designed to advance learners' technological fluency and critical thinking skills.<br><br>• ***Humanities and Aesthetics provides comprehensive learning at the intersection of history, art and literature. The program is designed to cultivate learners' cultural and aesthetic literacy.*** |
| 7 | 154 | 2022-07-29 | Earnings call | In the first quarter, we improved products and services of our existing programs, leveraging our expertise in users' learning journey, as well as our knowledge in pedagogical methodologies. ***In addition to our current programs covering science and creativity***, coding and programming, ***and humanity and aesthetics***, we also wrote out new programs such as international chess, rhetoric, and natural science learning. |

5

| # | ¶¶ | Date | Source | Statement |
|---|-----|------|--------|-----------|
| 8 | 155 | 2022-07-29 | Earnings call | First of all, learning services and other business continued to execute our existing programs while also launching a few new programs. ***We believe learning services are beginning to demonstrate a viable business model*** and will continue to drive the business around product portfolio expansion, experience optimization and operational efficiency. |
| 9 | 157 | 2022-07-29 | Earnings call | Q: Hi, management. Thank you very much for the presentation. This is Mark Li from Citi. May I ask a question on the enrichment learning program? Could you share a bit more on the operating metrics such as the retention rate and ASP and any more subjects or classes that you may expand down the road? Thank you. DEFENDANT DING: Yes, Mark. Thanks for the question. ***I would say our enrichment learning team and business have been primarily focused on two things. One is product and service center adaptation across various enrichment programs. And two, finding the right learning processes and user journeys for our learners and improving their satisfaction.*** We believe operating metrics are end results of such operational focuses. ***At this point, enrichment learning business is still at its early stage.*** We're still in process of optimizing various operational metrics, but we also see some early trends of this business. ASP for the quarter remains relatively stable compared to that before the whole business restructure. |
| 10 | 160 | 2022-10-28 | Earnings call | First, for our learning services business, we'll continue with our efforts in advancing product development, optimizing our go-to-market strategy, and further exploring opportunities in overseas markets. ***We believe its healthy business model combined*** with our strong branding and operational efficiency will enable us to be well-positioned to capture the market opportunities and deliver long-term value. |

6

| # | ¶¶ | Date | Source | Statement |
|---|---|---|---|---|
| 11 | 162 | 2022-11-01 | 20-F | I have reviewed this annual report on Form 20-F of TAL Education Group [] Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; |
| 12 | 163 | 2022-11-01 | Form 20-F | We have been closely monitoring the evolving regulatory environment and are making efforts to seek guidance from and cooperate with the government authorities to comply with the Alleviating Burden Opinion and its implementation measures. In compliance with the Alleviating Burden Opinion Regarding Compulsory Education and applicable rules, regulations and measures, *we ceased offering K9 Academic AST Services in mainland China by the end of December 2021*. Such cessation has had a significant negative impact on our financial performance for the fiscal year ended February 28, 2022 since revenues from offering K9 Academic AST Services accounted for a substantial majority of our total revenues prior to our cessation of such business, and is expected to have a significant negative impact on our financial performance for the fiscal year ending February 28, 2023 and subsequent periods, compared with that of previous years. *Due to the complexity and substantial uncertainty of the regulatory environment, we cannot assure you that our operations would be in full compliance with applicable laws, regulations and policies, including the Alleviating Burden Opinion and its implementation measures, in a timely manner, or at all.* |
| 13 | 165 | 2023-01-19 | Earnings call | Although the revenue of this quarter was affected by exchange rate fluctuations and seasonality, our new business has maintained the momentum of continuous development. We expect our main businesses to continue to develop in the next few quarters. The first, our learning services and other business, we'll continue to strengthen the quality of the |

7

| # | ¶¶ | Date | Source | Statement |
|---|-----|------|--------|-----------|
|   |     |      |        | products and services, while also gradually roll-out more programs and increase our physical footprint. We are a believer of ***enrichment learning*** and all-around development. As the market for ***enrichment learnings*** pickups, we plan to leverage our (inaudible) learning and our operational knowhow to further serve our customers. |

8