**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs and the putative class*

— additional counsel on signature page —

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JORDAN LEWANDOWSKI, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>TAL EDUCATION GROUP, and BANGXIN ZHANG,<br><br>    Defendants. | **Case No.: 2:23-cv-01769-MEF-JRA**<br><br>Hon. Michael E. Farbiarz, U.S.D.J<br><br>CLASS ACTION |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   FACTS...................................................................................................3

      A.    The Chinese Government Bars For-Profit Academic Tutoring ......3

      B.    TAL Claims to Shift to Non-Academic Offerings Error! Bookmark not defined.

      C.    TAL's Offerings Were Just Old Academic Tutoring Classes Under a Different Name...................................................................4

      D.    CaiLian Reveals that TAL Had Been Teaching Academic Courses .........................................................................................6

III.  THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY ...................7

      A.    Standard .........................................................................................7

      B.    The Complaint Sufficiently Alleges that TAL's Statements About Its New Offerings Were False ...................................................8

            1.    *The* Creative Thinking *classes were just curricular math classes* .................................................................................9

            2.    Humanistic Creation *is just a Chinese class* ...........................14

      C.    The Complaint Sufficiently Alleges that TAL's Statements Describing the Changes Between Its Academic Classes and Enrichment Offerings Are False .....................................................16

      D.    TAL's Statements That It Complied with the Law Are False .......19

      E.    The Complaint Sufficiently Alleges that TAL Systematically Violated the Double Reduction .......................................................27

      F.    The Relatively Small Number of Enforcement Actions Against TAL Is Not Exculpatory On A Motion to Dismiss .........................31

IV.   THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER .............35

V.    CONCLUSION ...................................................................................40

i

# TABLE OF AUTHORITIES

Page(s)

Cases

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ......................................................................20

*Better v. YRC Worldwide Inc.*,
  2012 WL 4433500 (D. Kan. Sept. 25, 2012) ...........................................27

*Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*,
  2012 WL 1030474 (N.D. Ill. Mar. 27, 2012) ..........................................32

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
  2019 WL 2865452 (D.N.J. July 3, 2019) .................................................31

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ...............................................................36

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  527 F. Supp. 3d 1151 (N.D. Cal. 2021) ...................................................17

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ..................................................... 7, 19, 28, 31

*Doe v. Pennsylvania State Univ.*,
  2023 WL 7287217 (M.D. Pa. Nov. 3, 2023) ...........................................24

*Fan v. StoneMor Partners LP*,
  927 F.3d 710 (3d Cir. 2019) ....................................................................36

*Ford v. Nat. Health Trends Corp.*,
  2016 WL 11809261 (C.D. Cal. Dec. 5, 2016) .........................................35

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018) .....................................................39

*Gordon v. Dailey*,
  2018 WL 1509080 (D.N.J. Mar. 27, 2018) ..............................................24

ii

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
2022 WL 889158 (E.D. Pa. Mar. 25, 2022)...........................................................37

*Handal v. Tenet Fintech Group Inc.*,
2023 WL 6214109 (E.D.N.Y. 2023) .....................................................................24

*Heckler v. Chaney*,
470 U.S. 821, (1985).............................................................................................33

*In re ATI Techs., Inc. Sec. Litig.*,
216 F. Supp. 2d 418 (E.D. Pa. 2002) ...................................................................18

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) ..................................................................19

*In re Celgene Corp. Sec. Litig.*,
2019 WL 6909463 (D.N.J. Dec. 19, 2019)............................................................7

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
586 F. Supp. 3d 199 (E.D.N.Y.) ..........................................................................39

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023) ............................................... 20, 23, 25, 39

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ................................................................26

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................35

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...............................................................33

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023)................................................. 28, 29

*In re Tenet Healthcare Corp. Sec. Litig.*,
2017 WL 11638941 (N.D. Tex. Dec. 20, 2017).....................................................32

*In re Twitter, Inc. Sec. Litig.*,
2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ......................................................32

iii

*In re Urb. Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................... 18, 31, 37

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................33

*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ............................................... 18, 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  258 F. Supp. 3d 1037 (N.D. Cal. 2017) .............................................26

*In re Wells Fargo & Co. Sec. Litig.*,
  2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021) .............................................26

*In re Xunlei Ltd. Sec. Litig.*,
  2019 WL 4276607 (S.D.N.Y. Sept. 10, 2019) .................................. 20, 23, 25, 33

*In re Zillow Grp., Inc. Sec. Litig.*,
  2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)............................................ 19, 35

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)........................................................ passim

*Karam v. Corinthian Colleges, Inc.*,
  2012 WL 8499135 (C.D. Cal. Aug. 20, 2012).....................................................32

*Kauffman v. Nat. Health Trends Corp.*,
  2019 WL 7165921 (C.D. Cal. Dec. 20, 2019) ...................................................26

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ...............................................40

*Lebanon Cnty. Employees' Ret. Fund v. Collis*,
  2023 WL 8710107 (Del. Dec. 18, 2023) ............................................19

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
  No. CIV.A, . 09-799, 2011 WL 2444675 (D. Del. June 14, 2011) ......................28

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019)...............................................31

iv

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015)......................................................................40

*Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*,
  372 F. Supp. 3d 1139 (D. Colo. 2019)........................................ 8, 17, 36

*Phillips v. County Of Allegheny*,
  515 F.3d 224 (3d Cir. 2008)........................................................................7

*Resnik v. Woertz*,
  774 F. Supp. 2d 614 (D. Del. 2011)...........................................................8

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)...............................................37

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016)......................................................................8

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) .....................................................37

*Shaev v. Saper*,
  320 F.3d 373 (3d Cir. 2003).......................................................................8

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992).....................................................................18

*Sun v. TAL Educ. Grp.*,
  2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023).......................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).....................................................................................7

*Weston v. DocuSign, Inc.*,
  2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) .......................................17

v

## I.  INTRODUCTION[1]

In July 2021, to address rampant abuses in the industry, the Chinese government outright prohibited for-profit academic after-school tutoring (dubbed the "Double Reduction"). The Class Period begins with TAL Education's January 2022 statement that it had complied with the Double Reduction by scrapping its old after-school tutoring programs. Over the next year, TAL repeatedly told investors that it had created new so-called "enrichment" offerings which helped curious children learn about topics they deemed interesting. TAL said, in response to repeated analyst questions, that the programs were "very different" in both their "content" and "format" from the academic classes that TAL used to offer.

TAL's statements were false: its new "enrichment" offerings were just its old curricular classes with different names. TAL's *Creative Thinking* series, one of only five in its portfolio, aped its old, now-unlawful curricular math classes as well as the curricular classes it taught outside China. It covered the official curriculum published by the Chinese Ministry of Education. Another suite, *Humanistic*

---

[1] Citations to "¶_" are to the operative Complaint, ECF No. 20. Citations to "Exhibit A" are to Exhibit A of the Complaint, ECF No. 20-1. Citations to "Def.Br._" are to pages of TAL's Memorandum of Law in Support of its Motion to dismiss the Complaint, ECF No. 29-1. Citations to "Pl.Ex._" are to Exhibits to the Declaration of Jonathan Horne, filed herewith. Unless otherwise noted, all emphases are added and citations omitted.

*Creation*, were just curricular Chinese classes. Its promotional materials frankly told parents that TAL's "enrichment" offerings would teach their children the same material they learned at school. Indeed, TAL's "enrichment" offerings had lectures, homework, and exams—the hallmarks of academic classes.

On March 14, 2023, an investigative team working for the CaiLian News Agency reported ("CaiLian Report") that TAL was teaching academic classes. The CaiLian Report published course syllabi and promotional materials, and disclosed TAL employees' incriminating statements. That day, TAL's stock price fell 10%.

In TAL's rewriting, the Court can dismiss the Complaint based on its answer to one question: did TAL subjectively believe that its classes violated the Double Reduction? But TAL did not merely make false statements that it complied with the Double Reduction, although it did do that. TAL also described the steps it had taken to comply—the programs it had terminated, the new offerings it had developed, and their budding success—giving the misleading impression that it had overhauled its operations. TAL ignores, and thereby concedes, these statements' actionability.

And TAL's only real argument that it complied with the law is that the Chinese government has yet to institute an enforcement action. But that is an argument courts routinely reject, including in the cases TAL cites. Governments have all sorts of reasons not to enforce their laws against particular culprits. The government's forbearance could result from no more than that China faces a historic

2

unemployment crisis among young college graduates and after-school tutoring is a labor-intensive industry that employs that demographic in droves.

Because the Complaint sufficiently states a claim, the Court should deny TAL's motion to dismiss.

## II.    FACTS
### A.    The Chinese Government Bars For-Profit Academic Tutoring

The academic after-school tutoring industry that originated in China in the '90s had by the late 2010's grown—in the Chinese government's estimation—into a public scourge. ¶58. Knowing that parents feared their children faced zero-sum competitive high-stakes examinations, companies blanketed the media with advertisements telling them their children would start life at a disadvantage without after-school tutoring. ¶51. These campaigns succeeded, though the industry was rife with consumer fraud. ¶52. The average amount of time *all* children spent in after-school tutoring classes, *including* children who received none at all, was 50 minutes each weekday and two hours each weekend. ¶54. After-school tutoring could consume 25-50% of families' disposable incomes, on average. *Id.*

After a series of reforms and regulations proved insufficient, ¶¶59-64, in July 2021, the Chinese government enacted the Double Reduction prohibiting *all* for-profit companies from even engaging in after-school tutoring. ¶¶67, 70. At a stroke, the government eliminated a $100 billion predatory industry, and the source of 75-80% of TAL's revenues. ¶¶55, 81.

3

In November, the Chinese central government ordered noncompliant companies to stop conducting after-school tutoring by December 31, 2021. ¶81. In January 2022, TAL told investors it had ceased academic after-school tutoring entirely by the prescribed deadline. ¶84.

**B.      TAL's Continues To Offer Academic Tutoring Classes Under a Different Name**

In April, TAL announced new, purportedly compliant "enrichment" offerings. TAL claimed its "Science and Creativity" suite would "develop learners' scientific curiosity and problem-solving capabilities" using "observation, analysis and application of various scientific phenomena and theories". ¶146. Other "Humanities and Aesthetics" offerings would "provide[] comprehensive learning at the intersection of history, art and literature", thus "cultivat[ing] learners' cultural and aesthetic literacy." *Id.* Asked about the programs, TAL confirmed that they were "very different from academic after-school tutoring and services," including in both their "content" and "format." ¶92. TAL also revealed that its "enrichment" offerings accounted for 45% of its revenues, wildly surpassing analyst expectations.  ¶¶ 89-90.

TAL's claims were false: its new "enrichment" offerings were its old academic tutoring classes renamed. ¶94. TAL's "science and creativity" and "humanities and aesthetics" did not denote a suite of classes catering to different interests but a single uniform program throughout China. *Id.* "Science and creativity" offerings were

called *Creative Thinking* and were just curricular math classes. *Id.* "Humanities and aesthetics" offerings were called *Humanistic Creation* and were just curricular Chinese classes. ¶96.

TAL structured its enrichment offerings by grade level rather than student interest. ¶94. Plaintiffs obtained TAL's third grade summer and fall "creative thinking" enrichment learning syllabus. ¶101. An earlier version of TAL's third-grade creative thinking class was posted on a Chinese social media site, Weibo. *Id.* Seven of twenty-five lessons teach arithmetic, two teach geometry, and three teach data and graph analysis. *Id.* None of the lessons involves any non-curricular enrichment material. ¶¶101, 105(d), Exhibit A. The lessons cover the entire official math curriculum for Grades 3 and 4 math classes promulgated by the Chinese Ministry of Education's ("MOE Curriculum"). ¶108. And they are nearly identical to **both** TAL's pre-Double Reduction classes **and** the classes it teaches outside China, both of which are curricular. ¶¶105-06.

Likewise, the *Humanistic Creation* syllabi show it was just a curricular Chinese class. Both Plaintiffs and CaiLian reporters obtained the syllabus for TAL's classes for the summer before the first grade. ¶¶110, 116. The syllabi show the classes focus on the official curriculum for classes on the Chinese language MOE Curriculum for Grades 1-2 Chinese classes: learning Pinyin (transliteration of Chinese characters into Roman letters), building vocabulary, and learning to recite

5

ancient poems. ¶¶109, 111, 117. TAL employees separately confirmed to both CaiLian reporters and Plaintiffs' investigator that *Humanistic Creation* is nothing more than a curricular Chinese class. ¶¶112-13, 121.

The CaiLian investigative team published three promotional pamphlets. ¶124. One had two boxes comparing "what the school tests" and "what we are learning." *Id.* The second tells parents TAL's classes will help answer "classic question types in school-specific supplemental questions." *Id.* The third bragged of TAL's "curriculum benchmarking." *Id.*

Meanwhile, TAL continued to recruit teachers for academic tutoring positions. TAL's job postings listed the name of the class ("humanistic creation" or "creative thinking") and then, in parentheses, the class's subject matter ("mathematics" or "Chinese"). ¶131. TAL noted that the positions involved "subject-based testing" and required "educational research experience". ¶130. The Complaint cites positions advertised throughout TAL's operations, in Beijing, Shanghai, Nanjing, Hangzhou, and Foshan. ¶131.

### C.    CaiLian Reveals that TAL Had Been Teaching Academic Courses

On March 14, 2023, CaiLian published its Report revealing that TAL Education committed pervasive violations of the Double Reduction. ¶141. The CaiLian Report circulated widely in the Chinese-language press and in English-

language investor-oriented media like Bloomberg and stock analyst reports. ¶142.

That day, the price of TAL's ADSs fell $0.68 (10.0%) from its previous close. ¶143.

## III.   THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY
### A.   Standard

"'Faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.'" *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).  The Court "'draw[s] all reasonable inferences in favor of the plaintiff,'" *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *10 (D.N.J. Dec. 19, 2019) (quoting *Phillips v. County Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)), and dismissal is improper if a plaintiff alleges a "plausible" claim raising "a 'reasonable expectation that discovery will reveal evidence' of the necessary elements.'" *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 681 (3d Cir. 2023).

The elements of a §10(b) claim which TAL contest are (1) a material misrepresentation or omission ("falsity") (2) made with scienter. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). The Complaint alleges falsity by "specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007).

B.       **The Complaint Sufficiently Alleges that TAL's Statements About Its New Offerings Were False**

TAL spends pages arguing that the Complaint does not sufficiently allege that its classes were clearly prohibited by the Double Reduction. *E.g.* Def.Br. 10. TAL all but ignores the Complaint's allegations that it falsely described the steps it had taken to comply with the Double Reduction. As set out below, any ambiguity as to the Double Reduction's outer limits is irrelevant because TAL's practices fell within the core of its prohibitions. But even if the contours of the Double Reduction had been murky, TAL's descriptions of its practices would still be actionably false statements. *E.g. Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1151–53 (D. Colo. 2019) (when plaintiffs alleged defendants engaged in illegal patient steering, examining truth of steering statements independently of legality of steering arrangement); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) (false statement that certain studies supported FDA approval actionable even though FDA eventually did approve product); *Resnik v. Woertz*, 774 F. Supp. 2d 614, 631 (D. Del. 2011) (*citing Shaev v. Saper*, 320 F.3d 373, 384 (3d Cir. 2003)) ("According to Third Circuit precedent, the risk that a bonus might not be tax deductible and the information necessary to determine whether it is deductible are material to the average investor at the time of the Proxy Statement, regardless of the IRS's ultimate determination on the matter."). Because Plaintiffs rely on TAL's statements, they need not "identify with particularity the 'when,

8

where and who was involved' in the purportedly illegal scheme." *DaVita*, 372 F. Supp. 3d at 1152.

     *1.*     *The* Creative Thinking *classes were just curricular math classes*

Both on conference calls and in SEC filings, TAL told investors that its offerings included a "[s]cience and creativity [program which] guides learners through observation, analysis, and application of various scientific phenomena and theories [] designed to develop learners' scientific curiosity and problem-solving capabilities."  E.g. ¶86. But TAL's "science and creativity" offerings were just a series of classes, called *Creative Thinking*, which covered the material Chinese students learned at school in their math classes.

Including the Weibo post, Plaintiffs plead the contents of 4 post-Double Reduction TAL *Creative Thinking* syllabi. ¶101. Each syllabus is aimed at a particular grade level. For example, the syllabi Plaintiffs obtained are for TAL's pre-Grade 3 summer and Grade 3 fall classes. ¶104. Each of these syllabi shows TAL's courses mirror what Chinese schools teach in the respective grade's math classes. Of the 25 lectures in the syllabi Plaintiffs obtained, at least seven were devoted purely to arithmetic, at least two taught geometry, and at least three taught basic data and analysis. ¶104. Three additional lectures focused on the tree-planting problem, a specific math problem that regularly appears on school exams. ¶104 & n.7; p.13,

9

infra. The remainder taught math techniques and word problems. ¶104. The syllabi speak for themselves: *Creative Thinking* is a curricular math class.

Moreover, the *Creative Thinking* syllabi closely match avowedly curricular math classes that TAL teaches outside China under its Think Academy brand. These classes, which were not subject to the Double Reduction, included the same lessons on arithmetic and basic geometry. ¶105(a)(c). Neither had any extracurricular content. ¶105(d). And the *Creative Thinking* syllabi likewise matched TAL's curricular pre-Double Reduction classes. ¶106.

The *Creative Thinking* Syllabi also tracked the MOE Curriculum. The Complaint quotes the MOE Curriculum and explains how each of the syllabi's lectures matches one of its elements. ¶108. TAL's contends that the MOE Curriculum is "vague and overbroad", Def.Br. 30, but its contents (e.g. "recogniz[ing] natural numbers", "perform[ing] complex integer arithmetic operations", and "go[ing] through the process of measuring the perimeter and area of plane shapes") belie TAL's claim.  ¶108.

More, TAL taught *Creative Thinking* uniformly throughout China and by grade level. TAL questions why any given child would have an interest in a particular subject, such as microbiology, the history of mathematics, or dinosaurs. Def.Br. 29. But that's exactly the point. Different children have different extracurricular interests. That's why enrichment learning programs target different interests—

10

including dinosaurs and micro-organisms, as well as dance, piano, or ping-pong. TAL's one-size-fits-all program mirroring the official curriculum in every class is antithetical to non-academic extracurricular offerings. Moreover, it is the rare child who has a passionate interest in the subject of TAL's *Creative Thinking* classes, arithmetic. And instead of dividing students by interests, TAL divided them by grade levels. This structure makes no sense for enrichment classes targeted at children who have a common extracurricular interest, but it is perfect if the goal is to provide tutoring to students who have in common that they are all in the same school grade.

This is overwhelming evidence; TAL misstates it. TAL does not even address the fact that its classes are taught at grade levels. Instead, TAL argues, generally, that the syllabi's class descriptions are too brief to infer their contents. But a class on "[s]olving multiplication calculation cleverly, rounding up technique, special number calculation, distributive law, extraction of common divisors", Exhibit A, is plainly about arithmetic. TAL also posits that it might use a different method of classroom instruction that might turn the class into what TAL said it was ("guid[ing] learners through observation, analysis, and application of various scientific phenomena and theories [] to develop learners' scientific curiosity and problem-solving capabilities"). ¶146. Yet TAL used the word "lecture" to describe its sessions and it is quite a stretch to describe basic arithmetic ("solving multiplication", "calculating intervals", or "recognizing odd and even numbers") as a "scientific

11

phenomen[on] [or] theor[y]". And if TAL's enrichment program involved something beyond traditional classroom teaching, its syllabi would at least reference the activity. Parents want to know what their children are doing. Instead, beyond the course titles, the syllabi only mention the specific concepts the offering would teach.

TAL cherry-picks particular words from the syllabi that it claims touch on non-curricular concepts. Def.Br. 28. But even as to these, the context makes clear that the subjects are curricular. For instance, TAL points out that the Autumn Lecture Session 5 topic is "Endless trees". The tree-planting problem is a form of question commonly used in Chinese school exams to help test students' understanding the math concept of intervals. ¶¶104 & n. 7. The two classes before Session 5 teach the tree-planting problem and Session 5's learning focus is "Intervals". The class is called "endless trees" because it is the third consecutive class teaching students to solve the tree planting problem. And while TAL cites a class titled "animal adventure", it omits that the class concerns the "practical application" of certain arithmetic operations. It is a math class with word problems. TAL points out that some classes teach "clever" solutions, but ignores that they are "clever" tricks ***to solve math problems*** (e.g., "clever calculation of perimeters", "clever calculation of addition and subtraction", "solving multiplication calculation cleverly", and so on). Likewise, TAL quotes a reference to "problem-solving", but its partial quote is

12

misleading. The full phrase is "*mathematical* problem-solving." These were just classes on arithmetic.

TAL's remaining scatter-shot attacks fail. TAL's argument that the syllabi could not have been for math classes because it does not set out specific math problems, Def.Br. 27, misunderstands what a syllabus is. A syllabus sets out the concepts taught in a class. There is no reason for the syllabus's summary of Summer Lecture Session 7 to say that it involves "calculating 1,345 divided by 384"; it says it covers "large number division in calculation."

TAL's attempt to distinguish its Grade 3 *Creative Thinking* classes from its foreign Think Academy curricular classes is similarly baseless. TAL does not dispute that both focus on arithmetic, geometry, and other topics taught in Grade 3 class. Def.Br. 28. In fact, TAL's sole dispute is that the *Creative Thinking* class teaching students to estimate the perimeter of shapes also explains that students will "cultivate graphic cognition and logical analysis ability", while the corresponding Think Academy class teaches students to "understand the meaning of perimeter in life". These are two ways of describing similar concepts.

Finally, TAL half-heartedly questions the authenticity of the syllabi Plaintiffs obtained because they do not on their face indicate that they are post-Double Reduction classes. Def.Br. 28. TAL ignores the Complaint's allegations, which the Court must credit. The Complaint alleges that Exhibit A is the syllabi for two of

13

TAL's *Creative Thinking* classes, ¶104, which TAL did not offer before the Double Reduction. Indeed, TAL admits that the syllabi are official when it declares (without evidence) that the *Humanistic Creation* syllabi are not official without also challenging the *Creative Thinking* syllabi. Def.Br. 31 n.7.

2.    Humanistic Creation *is just a Chinese class*

TAL describes its "Humanities and aesthetics" offerings as "provid[ing] comprehensive learning at the intersection of history, art, and literature [to] cultivate learners' cultural and aesthetic literacy." ¶146. Yet TAL's humanities and aesthetics offerings, which it called *Humanistic Creation*, were just Chinese classes, with lectures, homework, and exams.

FE 4 told Plaintiffs' investigator that Humanistic Creation is nothing more than "Chinese, reading and writing". ¶121. The facts bear out FE 4's account. Plaintiffs and CaiLian both obtained a syllabus for *Humanistic Creation* offerings for students entering grade 1. ¶¶111, 116. The offerings followed the MOE Curriculum Guide for Grades 1-2. The MOE Curriculum stresses four elements: (1) increasing students' vocabulary; (2) recognizing and writing basic Chinese characters; (3) learning Pinyin, the romanization of Chinese characters; and (4) learning Chinese-language texts. ¶109. TAL's syllabi shows its classes hit them all. CaiLian's pre-grade 1 syllabus stated in the description of each lecture that it would include Pinyin education, highlighting the passage each time it appeared. ¶111. A

14

TAL employee also boasted that "[i]f you continue to follow along, you don't need to worry about the preschool to primary school transition," adding that each class would include 10 minutes of Pinyin. ¶112. Another TAL employee in another city also told CaiLian that each class would include an identical 10 minutes of Pinyin, adding that "Pinyin [is] essential for the transition to primary school" and "must be included" in TAL's classes. ¶113. TAL's argument that the total class time spent on Pinyin education might not match official guidance ignores that the MOE Curriculum sets out pedagogical objectives, it does not allocate class time.

The pre-Grade 1 syllabus that Plaintiffs obtained included acquiring vocabulary as a critical metric. ¶117. In total, students were to learn 300 words in total over the summer classes, putting students who also took fall and spring classes within reach of the MOE Curriculum Guide's 1,600-word target. Even if the target referred to a list of specific words, rather than a general target that students know 1,600 words, whatever they are (it doesn't), TAL has no reason to teach students a set of wholly different words from the curriculum. Moreover, there are not many other words for TAL to teach. The Ministry of Education's vocabulary target for students leaving grade 9 is 3,500 words. Pl.Ex. 1.

Third, both CaiLian and Plaintiffs' pre-Grade 1 syllabi emphasized learning texts by rote, just like the MOE Curriculum Guide. ¶118. Three of the poems and four of the poets are on the MOE Curriculum of recommended texts for Grades 1-8.

¶119. TAL's argument that its classes do not cover most poems taught in Grades 1-2 again mistakes the quantitative goal (learn 50 poems, whatever they are) with a direction to learn 50 specific poems. More, CaiLian's syllabus for the Grade 2 *Humanistic Creation* class again shows that students are learning texts, above grade level, by rote. ¶120.

C.    **The Complaint Sufficiently Alleges that TAL's Statements Describing the Changes Between Its Academic Classes and Enrichment Offerings Are False**

In a pair of Forms 6-K filed with the SEC, TAL announced (1) that it **would** stop after-school tutoring before December 31, 2021, and (2) that it **had** done so. ¶¶83-84; Pl.Exs. 2-3. TAL dubbed its new offerings "enrichment programs", suggesting that they were untethered to the school curriculum. ¶86. In response to analyst questions on the FY 2022 and Q1 2023 earnings calls, TAL claimed its enrichment offerings differed from its pre-Double Reduction academic class in both content and format. ¶¶147, 157. Defendants explained that "these kinds of classes typically will foster a lot more interaction, a lot more student-driven activity" than TAL's pre-Double Reduction classes. *Id.* With no meaningful difference between TAL's "enrichment" offerings and its pre-Double Reduction classes, the claims that TAL had overhauled its offerings, as well as the offerings' description as "enrichment", gave investors the misleading impression that they differed from pre-

16

Double Reduction classes. The Complaint sufficiently alleges falsity. *DaVita* 372 F. Supp. 3d at 1151-52.

On the FY 2022 earnings call, TAL stated that "[w]e have witnessed demand from our customers to develop as well-rounded people and lifelong learners. Our enrichment programs are designed to capture that demand." ¶146. TAL argues that these statements are puffery, but ignores that the statements do not discuss TAL's aspirations for itself but instead describe the content and purpose of its own classes and customers. Whether TAL's classes are excellent may be indeterminate; whether TAL "designed" its offering to appeal to customers who seek lifelong learning, as opposed to parents who just want after-school tutoring, is a hard fact. *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *18 (N.D. Cal. Apr. 18, 2023) (company's pandemic-era statement that customers who had adopted electronic signature software "have the DocuSign experience are in the kind of more digitized experience" actionable because customers indicated they intended to return to pen and paper once pandemic receded); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1168, 1151 (N.D. Cal. 2021) (statement that customers used cloud services because they were "successful using [Oracle's] software" not puffery because customers' reasons for purchasing product "can be verified"). TAL's cases (Def.Br. 37) are inapposite for the very reason it maintains

they are relevant: there, the companies were vaguely praising their own customer service or focus. Here, TAL was describing its customers.

TAL's statements describing its enrichment programs as "healthy" or "viable" are also actionable. By describing the source of their revenues or income, companies put the subject in play and are duty-bound to disclose any facts necessary to make such descriptions not misleading. *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 652 (E.D. Pa. 2015) (statements about sales trends triggered duty to disclose negative trend); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *as amended* (May 27, 1992) (description of loan loss reserves as "conservative" actionable); *see also In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) (finding actionable description of revenues as arising from "sales and marketing efforts", though in truth material portion of revenues arose from bribery). "[A]ccurately depicting successful financial performance, but attributing the performance to the wrong source, is misleading." *In re Urban Outfitters, Inc. Securities Litigation*, 103 F. Supp. 3d at 651 (quoting *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 435–36 (E.D. Pa. 2002) (attribution of revenue to new product rather than old misled investors).

As in *VEON*, TAL's revenues resulted from violating the law. TAL's purportedly non-curricular program was neither "healthy" nor "viable", regardless of how much money it currently earned. It would last only as long as the Chinese

18

government tolerated TAL's violations of the Double Reduction. *VEON*, 2017 WL 4162342, at *6 (statement that results "demonstrat[e] the underlying strength of our core" actionable).

Nor does it matter that Defendants framed the statement as an opinion. An opinion that "contain[s] expressly 'embedded' factual assertions [is] misleading if any of the factual assertions are untrue." *Prudential*, 70 F.4th at 685. Describing a business as "healthy" or "viable" contains the embedded assertion that it is legal.

### D.      TAL's Statements That It Complied with the Law Are False

A plaintiff may show that a company's statements concerning legal compliance are actionable by pointing to specific laws the company's practices violated, even if regulators have not acted, *see, e.g.*, *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *3 (W.D. Wash. Apr. 19, 2019), and even if the courts or regulators found the defendants not liable. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 636 (S.D.N.Y. 2017) (foreign legal violations where court had dismissed criminal charges); *Lebanon Cnty. Employees' Ret. Fund v. Collis*, 2023 WL 8710107, at *17 (Del. Dec. 18, 2023) (other court's factual finding that defendant did not engage in underlying wrongdoing does not permit dismissal of otherwise properly-pled claim). *See also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end [a plaintiff's] case when [the plaintiff] has otherwise

19

met the pleading requirements of the PSLRA."). Indeed, even Defendants' cases hold as much. *In re Xunlei Ltd. Sec. Litig.*, 2019 WL 4276607, at *7 (S.D.N.Y. Sept. 10, 2019) ("[T]o state a claim, the FAC must plausibly allege that notwithstanding this inaction by Chinese authorities, Xunlei's conduct did in fact violate Chinese law during the Class Period."); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 153 (S.D.N.Y. 2023).

In November 2021, before the Class Period, the Ministry of Education published its *Guide to Identification of Extracurricular Tutoring Programs for Compulsory Education* ("Identification Guidelines"). ¶125. The Identification Guidelines set out four factors to consider in considering whether an offering is academic: (1) if the offering's *Content* consists of academic material (including math or Chinese); (2) if the offering's *Objective* is to improve academic knowledge, skill, or performance; (3) if students are placed in classes based on academic performance and test results and *Evaluated* by testing academic performance; and (4) if the *Methods* involve "explaining academic knowledge" or "practicing listening" or academic skills, or involve "pre-lesson preparations, teaching, and reinforcement exercises" through "teaching demonstrations [] and interactions." ¶125.

As to *Content* and *Objectives*, TAL's offerings are overwhelmingly academic. In *Creative Thinking*, class after class focuses on "calculation", "division", "multiplication", calculating the perimeter and areas of shapes, and other topics

20

taught in elementary grade school math classes and covered in the MOE Curriculum. The *Humanistic Creation* classes also taught the MOE Curriculum, focusing on Pinyin, word acquisition, and poems. The "Core knowledge gained" (Exhibit A) column shows that the *Objectives* are to gain a series of academic skills. And, in any case, few third graders are interested in learning arithmetic as a hobby.

TAL's promotional materials confirmed that the *Content* and *Objectives* of its enrichment offerings were academic. TAL told parents that it taught to the test by highlighting that the questions it asked and the questions from school exams were almost identical. ¶97.[2] A TAL employee bragged to CaiLian reporters that its pre-Grade 1 class was meant to manage "the preschool to primary school transition." ¶111. Another stated that classes would teach certain topics because they were "essential for the transition to primary school." ¶113. Thus, TAL's characterization that it only advertised that its offerings could help students succeed in school by teaching them important life skills is spurious. Def.Br. 32.

TAL's "enrichment" offerings also meet the *Evaluation* and *Methods* factors. TAL's teaching methods were consistent with after-school tutoring. Its employees emphasized that "it comes down to putting pen to paper", describing "pre-class and post-class assessments" and "reinforcement exercises"—i.e., homework. ¶127. The

---

[2] Teaching to school exams shows far more than "a modicum of overlap", Def.Br. 26, it means TAL's classes are targeting curricular material.

21

last class "evaluat[es] the child's learning process"—i.e., there is a final exam.[3]

Further, TAL even maintained its pre-Double Reduction practice of stratifying classes by students' ability and grade, which the Identification Guidelines note is a hallmark of after-school tutoring. ¶128. And TAL's classes separate students by *grade level*, not interests.

TAL's job postings overtly admitted that its classes were curricular. TAL argues that the fact that the job postings required experience teaching math and Chinese does not establish that the teachers would in fact teach those materials. But TAL's speculation notwithstanding, the job postings themselves described what they were for: "humanistic creation (elementary school Chinese)" and "creative thinking [] (elementary school mathematics)". ¶¶130-31.

TAL argues that the Complaint does not provide content to the statutory term "academic". Def.Br. 11. But the Complaint quotes the Identification Guidelines and explains how TAL's conduct runs afoul of them. Next, it argues that the Identification Guidelines are not probative because they do not have the force of law. Def.Br. 13-14. But the Identification Guidelines are the Ministry of Education's authoritative interpretation of the term "academic" in the Double Reduction. And

---

[3] "Learning process" here plainly does not mean "learning style", Def.Br. 14-15, because it does little good to evaluate a child's learning style during the last session when it is too late for TAL to tailor its instructional method. It means what a child has learned in the class.

guidelines explain what the law is; that is their function. Then, TAL argues that the Identification Guidelines do not contain a formal definition of "academic". Def.Br. 14. But it is common for laws and regulations to define prohibited conduct by listing factors tending to show illegality. *See, e.g.*, Securities & Exchange Commission, *Framework for "Investment Contract" Analysis of Digital Assets*, available at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (test for whether a cryptocurrency is a security depends on the presence or absence of certain factors which are not individually necessary but which must holistically make the required showing). TAL also argues that Plaintiffs do not allege that the authorities agree with Plaintiffs' interpretation. Def.Br. 12. But the Identification Guidelines support Plaintiffs interpretation, and if TAL means that Plaintiffs must plead that Chinese authorities have taken enforcement action against TAL, its own cases hold otherwise. *Xunlei*, 2019 WL 4276607, at *7; *DraftKings*, 650 F. Supp. 3d at 153. TAL argues that it disclosed that it might suffer penalties if the Chinese government found it violated the Double Reduction. Def.Br. 24. But the Complaint alleges that TAL lied about its operations, not that it concealed the risk that it might run afoul of the law. Similarly, a public disclosure that some companies were violating the law, Def.Br. 25, did not reveal TAL's widespread violations. Indeed, before the CaiLian Report, analysts thought TAL had a competitive advantage because they incorrectly believed its programs were "compliant." ¶100.

23

Next, TAL argues that Plaintiffs did not plead that they obtained verified translations. Setting aside that the Complaint's failure to plead verification does not mean its translations were not verified, documents are verified so that they can be used as admissible evidence. *Doe v. Pennsylvania State Univ.*, 2023 WL 7287217, at *4 (M.D. Pa. Nov. 3, 2023). But a complaint need not plead admissible evidence; it must plead facts. *Gordon v. Dailey*, 2018 WL 1509080, at *2 (D.N.J. Mar. 27, 2018) ("It is not necessary for the plaintiff to plead evidence."). Indeed, on a motion to dismiss, the Court accepts the plaintiffs' translations, even if the defendants provide a competing certified translation (which TAL did not do). *Handal v. Tenet Fintech Group Inc.*, 2023 WL 6214109, at *12 (E.D.N.Y. 2023). In any case, Plaintiffs attach a verified translation of the Identification Guidelines and the full CaiLian Report. Pl.Exs. 4, 5.[4]

TAL also pointlessly declares that the Complaint cannot rely on the CaiLian's report conclusions. Def.Br. 11. The Complaint relies on the facts CaiLian reported, not its conclusions. Ironically, a mere two pages later, TAL itself attempts to rely on CaiLian's conclusion rather than its facts. Def.Br. 13. Not only is TAL's argument self-refuting, it ignores that the rest of the article answers the question by providing evidence that TAL violates the Double Reduction. Pl.Ex. 5.

---

[4] Plaintiffs' translator elected to translate the word "pinyin" into "phonics", while Plaintiffs' complaint left it untranslated.

24

TAL's cases do not help it. In *Xunlei*, the defendants provided the unrebutted expert declaration of Professor Robin Huang, among other evidence, to show that the company's conduct was not illegal. 2019 WL 4276607, at *6 n. 7, *8. TAL has not so much as provided a translation of the laws it deems exculpatory. And in *DraftKings*, the plaintiffs had to "clearly elucidate the boundaries of" the foreign law **because** they alleged that the defendants did business in black market gambling jurisdictions. 650 F. Supp. 3d at 153. These are defined as jurisdictions where the governments "have issued **unequivocal** pronouncements that online gaming is not legal" or are actively enforcing laws against online gambling. *Id.* at 136, 165. Plaintiffs here do not need to show that the Double Reduction is "unequivocal" to plausibly allege TAL's liability. In any case, whatever the boundaries of the Double Reduction's prohibitions, TAL's enrichment offerings, which are full-on curricular classes, fall within its very core.[5]

---

[5] Defendants misread *Kauffman v. Nat. Health Trends Corp.*, 2019 WL 7165921, at *5 (C.D. Cal. Dec. 20, 2019). There, the court **actually concluded that the company was violating the law and defendants knew it.** *Id.* at *6. That should have been enough to find that the defendants made false statements. But the court misread other cases in which the plaintiffs alleged that the defendant failed to take an accounting reserve, most prominently *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 258 F. Supp. 3d 1037, 1042–43 (N.D. Cal. 2017). To support their accounting theory, those plaintiffs had to show that it was more likely than not that the undisclosed risk would have a material impact on the defendant company's financials over a given time period. *Kauffman* took this accounting fraud holding and erroneously universalized it by requiring that in all cases plaintiffs must show that defendants believed the undisclosed risks would have a material impact on the company. Recognizing *Kauffman*'s error, TAL does **not** argue that plaintiffs must

Moreover, TAL's statement that it complied with the Double Reduction, in context, is not merely that its programs might be technically compliant. TAL not only explained *that* it had complied with the law, but *how*: by "ceas[ing] offering K9 Academic AST Services in mainland China by the end of December 2021." ¶163 Because TAL falsely claimed it steered well clear of the Double Reduction, this case does not turn on whether TAL's conduct technically fell within its prohibitions. *See In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1228 (N.D. Ga. 2019) (statement that company took "great care" to comply with the law actionable because company's efforts were minimal); *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *8 (D. Kan. Sept. 25, 2012) (statements claiming concerns about company's covenant compliance were "noise" actionable notwithstanding that company was in compliance at the time).

TAL's remaining arguments are worth little time. TAL cites practices it claims the Double Reduction does not specifically prohibit. But the Double Reduction's silence on calculating perimeters (one of TAL's examples, Def.Br. 29) is not telling: it reflects that the Ministry of Education does not regulate at the absurd level of granularity TAL posits. TAL also states that the Double Reduction does not

---

show that TAL's violations were likely to result in material financial penalties. Thus, had *Kauffman* not made what even TAL acknowledges is a mistake, it would have found that plaintiffs sufficiently alleged false statements.

26

prohibit providing feedback. Def.Br. 14. But the Double Reduction prohibits academic tutoring and identifies graded tests, TAL's method of "providing feedback", as one of its characteristics.

TAL also speculates that even though its classes teach the curriculum, its promotional materials emphasize this fact, and its pedagogical approach is academic, its conduct might somehow be lawful. TAL points to an article alleging that one company couched some of its math lessons into an escape-the-room game, Def.Br. 27, but the Complaint nowhere alleges that the company was TAL, nor that it reflected TAL's customary practice, nor that such token compliance with the Double Reduction could possibly suffice.

### E.    The Complaint Sufficiently Alleges that TAL Systematically Violated the Double Reduction

The Court credits allegations drawn from former employees plaintiffs contacted if the complaint "describe[s] [the sources] with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *7 (D. Del. June 14, 2011). It suffices to describe the witnesses' "positions, duties, and time and place of employment." *Id.* Courts are more likely to credit confidential witnesses if multiple witnesses say the same thing or other facts or evidence corroborate their account. *Id.*; *Prudential*, 70 F.4th at 691 (courts consider "the degree to which other testimony or evidence

27

corroborates the witness's account"). The Complaint need not plead that the witnesses had any contact with defendants; it only needs to allege sufficient facts to support a plausible inference that the witnesses would know what they report. *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *5 (W.D. Pa. May 18, 2023) (low-level employees knew enough to support scienter).

The Complaint relies on the Former Employees to show that TAL's curricula, syllabi, and promotional materials were uniform and generated from its Beijing headquarters, where the Individual Defendants worked. The Complaint pleads the FEs' job titles and dates of employment. ¶¶31-39. The witnesses' accounts are similar, if not identical. FE 1, 2, 5, and 7-9 reported that course curricula and syllabi are approved at its headquarters. ¶¶171, 173, 175-76. According to FE 7, "[b]ranches don't have [the] authority [to approve curriculum]." ¶173. Only TAL's Beijing headquarters, and a small team in Shanghai, had any involvement in developing course materials. ¶¶171, 173, 175-76. FE 1 and 5-9 report that TAL created and dictated promotional materials from its Beijing headquarters. ¶¶170-73. FE 1 and 5 both report the same specific rule: anything that bears TAL's logo or mascot, like two of the three promotional pamphlets CaiLian obtained (¶124), must be approved at headquarters. ¶170. "That these accounts tell the same coherent story enhances the plausibility of that story." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *6 (W.D. Pa. May 18, 2023). And these witnesses came from TAL's operations

28

throughout China, including 3 of TAL's 5 major markets, Beijing (FE 1, FE 9), Shanghai (FE 2, 3, 8), and Nanjing (FE 6). ¶¶31-39. *See Institutional Invs. Grp. v. Avaya, Inc.,* 564 F.3d 242, 264 (3d Cir. 2009) (statements from low-level employees sufficient because they "represent the range of [defendant's] U.S. businesses").[6]

The witnesses would know about these restrictions because they formed part of their daily responsibilities. FE 2 developed course materials. ¶32. FE 2 would know what he was developing the materials for. ¶¶175-76. FE 6-9 were all responsible for marketing and sales promotion. ¶¶36-39. They would know what marketing materials they could—and could not—create. ¶¶171-73. Though TAL extravagantly declares that the Complaint does not show how FE 4 would know the contents of TAL's Humanistic Creation class, FE 4 was a course consultant and would know about the courses he was consulting on. ¶¶34, 121.

Moreover, Chinese media reported that TAL's materials were uniform. ¶179. And TAL itself concedes in this litigation that its materials were uniform. In a footnote, Def.Br. 31 n.7, TAL argues that the Court should discount allegations concerning the *Humanistic Creation* classes because, it says, the syllabi were not

---

[6] Citing a case from the Second Circuit, TAL asserts that plaintiffs must plead that the witnesses had contact with defendants. The sentence TAL partially quotes also holds that the lack of "personal interaction with [defendants]" "is not necessarily fatal." *Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at *31 (S.D.N.Y. Sept. 29, 2023). In any case, the Court follows *Avaya*, which found scienter based on low-level former employees' reports. *Avaya*, 564 F.3d at 264.

part of its official curriculum. Of course, the Court cannot simply disregard the Complaint's allegations based on TAL's say-so. But TAL does not dispute that the *Creative Thinking* syllabi are its official materials. TAL thus implicitly concedes that it uses official uniform materials and that among them are the *Creative Thinking* materials Plaintiffs pled.

To discount the confidential witnesses' allegations, TAL propounds a series of arbitrary requirements which it draws almost entirely from one outlier district-level case, *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452 (D.N.J. July 3, 2019). Yet *Chan*'s idiosyncratic requirements are contrary to the law. TAL claims *Chan* ruled that former employee statements must be quoted rather than paraphrased. Def.Br. 20. The Third Circuit has never imposed this requirement and routinely credits allegations from former employees whose statements are paraphrased rather than quoted. *Prudential*, 70 F.4th at 691; *Avaya*, 564 F.3d at 248. Nor does Third Circuit precedent require that the plaintiff allege exactly when a witness learned of the information making the statements false. *Chubb* set out factors to be weighed, not a checklist. *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 648 (E.D. Pa. 2015). Courts do not require plaintiffs to plead when witnesses learned the information they report if the allegations are otherwise particular and the timing is not relevant. *Id.* at 649 (witnesses credible notwithstanding no allegations of when witnesses learned facts because they described the existence and general contents of

30

internal databases); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019) (similar). And it would be strange for witnesses to recall exactly when they learned unremarkable facts (to them) they need to do their job.

TAL argues that the findings of regulatory violations do not suffice to allege "widespread violations, much less that TAL had simply renamed its courses and continued to teach the same pre-Double Reduction curriculum." Def.Br. 17, 35. But in the cases TAL cites, the plaintiffs relied on the regulatory violations themselves to establish widespread misconduct.[7] Here, contrary to TAL's bare assertion (Def.Br. 18), the Complaint establishes widespread violations by showing that TAL's violative conduct was uniform. The punishments were just the instances in which TAL was caught.

### F. The Relatively Small Number of Enforcement Actions Against TAL Is Not Exculpatory On A Motion to Dismiss

Though TAL claims otherwise (disagreeing with its own cases), Def.Br. 10-12, courts do not read the lack of enforcement proceedings as evidence that the defendant's conduct was lawful. *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at

---

[7] In TAL's cases, the plaintiffs did not provide an estimate of the amount of wrongdoing. *Karam v. Corinthian Colleges, Inc.*, 2012 WL 8499135, at *7 (C.D. Cal. Aug. 20, 2012) (plaintiffs do not "purport[] to quantify the total number of students affected by the alleged improper practices."); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, 2012 WL 1030474, at *4 (N.D. Ill. Mar. 27, 2012) (plaintiffs show "an apparent lack of company-wide knowledge"); *In re Tenet Healthcare Corp. Sec. Litig.*, 2017 WL 11638941, at *4 (N.D. Tex. Dec. 20, 2017) (plaintiffs only showed "a few" of defendants' many hospitals implicated).

*14 (N.D. Cal. Apr. 17, 2020), *order clarified* 2020 WL 2519890 (N.D. Cal. May 18, 2020) ("The fact that the SEC failed to take any adverse action with respect to Twitter's written disclosures has no bearing on the question of whether the challenged statements here were misleading."); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) (SEC declination to take action not probative at motion to dismiss stage).[8] *See also Xunlei*, 2019 WL 4276607, at *7 (plaintiffs may show illegality either by pointing to enforcement action or explaining how the conduct was illegal). Governments have all sorts of reasons not to bring claims, from a lack of resources to conflicting priorities. *See Heckler v. Chaney*, 470 U.S. 821, 831, (1985) ("[An] agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all."). Just like in the United States, various Chinese governments involved may not have had the resources to prosecute claims against TAL yet, may have preferred to prosecute smaller companies rather than a national champion, or may have preferred to jawbone TAL into compliance.

---

[8] *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 n.15 (N.D. Cal. 2009) (same).

The possibility of "spot checks" and "inspections" means nothing if the agencies are not sufficiently staffed to conduct them. Def.Br. 22.

But while not required, there is a specific plausible explanation for China's failure to enforce its laws. China faces a historic youth unemployment crisis.[9] The urban unemployment rate for 16-24-year-olds reached a record 21.3% in June 2023.[10] In July 2023, a record 11.6 million students graded from college; China stopped reporting youth unemployment figures. Xi Jinping called on youths to "eat bitterness," meaning accept hardship by taking lower-paying, lower prestige jobs that may not require a college degree in rural areas.[11]

After-school tutoring is a labor-intensive industry. Just seven publicly-listed companies employed 250,000 before the Double Reduction.[12] According to a pre-Double Reduction report co-authored by TAL, the education industry as a whole

---

[9] Claire Fu & Daisuke Wakabayashi, Don't Be So Picky About a Job, China's College Graduates Are Told, NY Times August 8, 2023, available at https://www.nytimes.com/2023/08/08/business/china-youth-unemployment.html
[10] *Id.*
[11] Ellen Zhang & Marius Zaharia, Chinese graduates hold off career dreams, take temporary government jobs, Reuters November 13, 2023, available at https://www.reuters.com/world/china/chinese-graduates-hold-off-career-dreams-take-temporary-government-jobs-2023-11-14/
[12] Evelyn Cheng & Wendy Ye, China's after-school crackdown wipes out many jobs overnight, CNBC August 29, 2021, available at https://www.cnbc.com/2021/08/26/chinas-after-school-crackdown-wipes-out-many-jobs-overnight.html

33

employed 10 million, 59% of whom were 30 years old or younger.[13] Pl.Ex. 6. According to the study, 88% of teachers had a college degree. *Id.* Temporarily tolerating academic tutoring keeps hundreds of thousands of young Chinese graduates off the unemployment rolls. But TAL's business is not sustainable: it depends on the Chinese government continuing to prioritize youth employment over the Double Reduction.

Defendants argue that the Complaint alleges an implausible scheme because it hid its noncompliance behind a thin veneer. But TAL Education is not the first business to tell its customers what services it offers while publicly proclaiming not to do so. In *Zillow*, the plaintiffs sufficiently pled securities fraud claim based on the allegation that the company offered real estate agents—of which there are hundreds of thousands—a program that would allow them to illegally take compensation from lenders for referrals. *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *1 (W.D. Wash. Apr. 19, 2019). In *Natural Health Trends*, the defendants operated an illegal multi-level marketing business in China whose "alleged violations of Chinese law were 'so obvious [the defendants] must have been aware of [them]." *Ford v. Nat. Health Trends Corp.*, 2016 WL 11809261, at *2 (C.D. Cal. Dec. 5, 2016). The company's thousands of members knew all about how it operated. In *In re Initial*

---

[13] The Report, in Chinese, is available at https://chinaiid.bnu.edu.cn/docs/2021-01/20210105171435185731.pdf. Translations of portions of the report are attached as Plaintiffs' Exhibit 6.

34

*Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 294 (S.D.N.Y. 2003), the plaintiffs alleged a conspiracy that swept up 55 investment banks working with untold numbers of institutional investors to rig the market for 309 Initial Public Offerings—that is, a significant proportion of companies involved in U.S. capital markets. In *DaVita*, the company allegedly steered at least 6,000 Medicare-eligible patients into more lucrative private insurance plans by paying their premiums. 372 F. Supp. 3d at 1144. And in one case, the defendant's fraud consisted of concealing from investors it had been told that the Chinese government would actually enforce its laws. *Christine Asia Co. v. Ma*, 718 F. App'x 20, 22 (2d Cir. 2017).

## IV.    THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER

Scienter may be shown "by a knowing or reckless state of mind." *Fan v. StoneMor Partners LP*, 927 F.3d 710, 718 (3d Cir. 2019) (citation omitted). "A strong inference of scienter is one that is 'cogent and ***at least as compelling*** as any opposing inference of nonfraudulent intent.'" *Avaya*, 564 F.3d at 267 (citation omitted). "The pertinent question is 'whether ***all*** of the facts alleged, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.*

In this Circuit, plaintiffs can allege scienter by showing that (a) a defendant made specific false statements (b) about a key aspect of the company's operations (c) that differed greatly from the true facts. When invoking this inference, the

35

plaintiff need not show how the defendants learned the contrary facts, because "the possibility that [defendant] was ignorant is not necessarily exculpatory." *Id.* at 270.

In *Avaya*, the plaintiffs alleged that during a fiscal quarter, the company had had to offer deeper and deeper discounts to its customers to entice them to purchase the company's services. In successive conference calls, the defendant answered analysts' question by denying that there had been any unusual discounts. *Id.* at 270. Though the plaintiffs pled no facts showing that the defendant knew about the discounts, nor how he could have learned of them, *id.* at 275, the Third Circuit nonetheless found scienter. *Id.* at 270.

Following *Avaya*, courts in the Third Circuit routinely find scienter when executives make specific statements about important parts of their business that are starkly at odds with reality even if the plaintiffs do not show how the defendants would learn the contrary facts. For instance, in *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 905–07 (E.D. Pa. 2018), the court found scienter sufficiently pled because a biotechnology company executive made specific public comments about clinical data for the company's second largest source of revenue while the plaintiffs merely alleged the contrary facts existed to be discovered. *Id. See also Urban Outfitters*, 103 F. Supp. 3d at 652-53 (finding scienter based on allegations that contrary facts existed, that they were important, that defendants were involved in the company, and that the defendants made false and consistent

36

statements, including in response to analyst questions); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21 (D.N.J. July 27, 2018) (allegations that defendants made false statements in response to direct questions about important matter sufficed); *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *16 (E.D. Pa. Mar. 25, 2022) (sufficient that defendants made false statements about company's critical drug and authorized payments to charity without showing that they knew charity was conducting Medicare fraud). None of the plaintiffs in *SEB*, *Urban Outfitters*, *Roofer's Pension Fund*, and *Halman* pled any facts showing ***how*** the defendants would have learned the facts contradicting their statements.

This case falls well within *Avaya* and its progeny. TAL issued two 6-Ks to announce the termination of its afterschool tutoring program. TAL then falsely described its purportedly new enrichment offerings and in response to analyst queries on two consecutive conference calls, claimed that the new offerings differed substantially from TAL's pre-Double Reduction classes. Not only were investors concerned with the new programs, they had every reason to be: the programs accounted for 45% of its revenues.

Defendants could hardly be ignorant that TAL had simply renamed its pre-Double Reduction plans. Abandoning TAL's materials and developing new, completely different programs, would have required ***immense*** efforts. TAL would

have had to develop detailed new plans, notes, syllabi, teaching aids, and many other materials, for each offering; TAL would have had to train thousands of employees on this new material. Thus, as in *Avaya*, TAL's representations are starkly at odds with the facts. So as in *Avaya*, if TAL did not know whether anything had changed, its confident and specific statements describing the changes were reckless.

TAL cites cases from the Second Circuit purportedly holding that access to information cannot account for an inference of scienter. These cases are distinguishable. In *DraftKings*, the court found that the plaintiffs had not alleged that defendants knew of the company's violations largely because it found that the plaintiffs had not alleged that there were violations. 650 F. Supp. 3d at 177-78 ("Most salient, the SAC—unsurprisingly given its failure to plead black-market operations adequately—makes only conclusory allegations that defendants knew of such operations."). *Chembio* is not persuasive in this Circuit because it rejects *Avaya*'s reasoning. *In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 222 n.10 (E.D.N.Y.), *reconsideration denied,* 616 F. Supp. 3d 192 (E.D.N.Y. 2022) (finding that the facts triggering an inference under *Avaya* were not sufficient without particularized allegations that the defendant was actually told information rendering statements false). In *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 210 (S.D.N.Y. 2018), *aff'd* 779 F. App'x 69 (2d Cir. 2019), the operations were not particularly important to the defendant, and the

38

statements concerned earnings guidance, so the defendant, a conglomerate, could have expected performance in another segment to make up for the underperformance the plaintiffs alleged defendants concealed. *Id.* at 221–22.

Nor is there any merit to TAL's argument that the "warnings" speak to its good faith. Def.Br. 16-17. In essence, TAL warned that (a) there was a Double Reduction, and (b) it was new and its interpretation was not yet settled. The Double Reduction made headlines worldwide. It was likely the single most important event in TAL's industry. TAL could not possibly have concealed its existence nor the resulting uncertainty even if it wanted to. That it made these minimal disclosures is not at all exculpatory. Moreover, unlike in both cases TAL cites, the disclosures told investors nothing about how ***TAL*** was responding to the Double Reduction. In *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd* 543 F. App'x 72 (2d Cir. 2013), the plaintiffs alleged that the defendant should have classified more of its loans as "sub-prime" (a then-undefined term), but the defendant "routinely detailed the credit characteristics of the loans in its [] portfolio [including] credit scores." *Kuriakose*, 897 F. Supp. 2d at 182. In *Owens v. Jastrow*, 789 F.3d 529, 540 (5th Cir. 2015), also a Great Recession case, the defendants publicly disclosed the very trends in the company's portfolio that plaintiffs alleged required the company to impair its loans. The *Kuriakose* and *Owens* defendants

39

would not have been transparent if all they had disclosed was that there were troubles in the market, which is all TAL did.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny TAL's motion to dismiss. If it grants the motion in any respect, it should grant leave to amend.

Dated:        February 13, 2024                **THE ROSEN LAW FIRM, P.A.**


/s/Laurence M. Rosen
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

-and-

Jonathan Horne (pro hac vice)
Jing Chen
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: jchen@rosenlegal.com


*Counsel for Plaintiffs and the putative class*

40

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/Jonathan Horne

41