UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

————————————————————————

JORDAN LEWANDOWSKI,
individually and on behalf
of all others similarly          CIVIL ACTION NUMBER:
situated,
                                 2:23-cv-1769-MEF
     Plaintiff,
                                 Oral Argument
          vs.

TAL EDUCATION GROUP, et al.,

     Defendants.

————————————————————————

     Frank R. Lautenberg Post Office and Courthouse
     Two Federal Square
     Newark, New Jersey  07102
     December 17, 2024

B E F O R E:                THE HONORABLE MICHAEL E. FARBIARZ,
                            UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S:

     MARINO, TORTORELLA & BOYLE, P.C., BY:
     KEVIN H. MARINO, ESQ., ESQ.
     JOHN D. TORTORELLA, ESQ.
     437 Southern Boulevard
     Chatham, New Jersey  07928

          appeared on behalf of Plaintiff;


          Lisa A. Larsen, RPR, RMR, CRR, FCRR
               Official Court Reporter
          Lisa_Larsen@njd.uscourts.gov
                 (973)776-7741


     Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.

**A P P E A R A N C E S**: (Cont'd.)

THE ROSEN LAW FIRM, BY:
JONATHAN HORNE, ESQ.
275 Madison Avenue
New York, New York  10016

        appeared on behalf of Defendants.

(PROCEEDINGS held in open court before the HONORABLE MICHAEL E. FARBIARZ, United States District Court Judge, on December 17, 2024.)

THE DEPUTY CLERK:  All rise.

THE COURT:  Folks, good morning.  Let's please have a seat.  We are here for *Lewandowski vs. TAL*.

Appearances, please, for the record, beginning with the plaintiffs' counsel.

MR. HORNE:  Good morning, Your Honor.  Jonathan Horne from the Rosen Law Firm for plaintiffs.

THE COURT:  Good morning to you.

MR. MARINO:  Good morning, Your Honor.  Kevin Marino, Marino Tortorella & Boyle, for defendants.  With me is my partner John Tortorella.

THE COURT:  Good morning to each of you.

I wanted to start with one question for Mr. Horne.  And, look, I just want to say at the outset Mr. Marino made a comment that I tend to be fairly forthright about my thought process, and I'm going to do that again.

I'm inclined exactly where I was last time, which is simply to deny this motion from the bench.

What I'm a little puzzled by, Mr. Horne, is what you have on Mr. Peng and Mr. Ding.

What are we doing in this case?

MR. HORNE:  Mr. Peng and Mr. Ding?

THE COURT:  Yeah.  I know who they are.  Mr. Peng is the CFO.  Mr. Ding I believe is the director of investor relations.  You're essentially making with respect to scienter a *Avaya*-type argument.

You're making a core operations argument without using that term for reasons I think I understand but -- and those kinds of arguments have an intuitive logic with respect to the chief executive officer.

But with respect to the CFO director of investor relations, how are you getting scienter on them?

MR. HORNE:  I do want to make a note for the CEO.  The complaint contains an error.  It states that --

THE COURT:  Can you speak up just a little bit, if you don't mind.

MR. HORNE:  I'm sorry?

THE COURT:  Speak up a little bit.

MR. HORNE:  Okay.  Just as to the CEO, Mr. Zhang, the complaint contains an error.  It says that he stopped being CEO in 2020.  We apologize.  That isn't true.  He continued to be CEO through the entire period and right up to the present.

THE COURT:  Let's come back to that in a second.

What about with respect to Mr. Peng and Mr. Ding?

MR. HORNE:  So Mr. Peng is also president and he was in charge of the company's strategy.  This isn't just a numbers guy.  He's got a long career at Mackenzie.

THE COURT:  I saw the Mackenzie piece.  I know that from the listing of the defendants.  You go through his history.

The pre-history at Mackenzie may arguably suggest what you want it to, which is that he's a relatively savvy observer, et cetera, et cetera.

What else do you have on Mr. Peng in the complaint? Why don't you show it to me.

MR. HORNE:  He was the president and in charge of strategy.  This isn't just a guy who comes in and makes sure the numbers work.

THE COURT:  I got it.  Mr. Horne, here is the problem: You haven't done meaningful work in the complaint to allege anything about the internal governing structure of TAL.

The reason I spoke about Mr. Peng as a chief financial officer is that there's a small set of titles, at least in the governing structure, that we're all more familiar with that implies something unmistakable about what the person's job is.

CEO is one of those things; CFO is one of those things. President of strategy is not one of those things; director of investor relations is not one of those things.

So you're asking me to infer something about what he must have known which is a *Avaya*-type argument, I get it, but that's a tougher argument without giving me anything about, A, Peng or Ding's direct involvement or, B, a real sense of what

the structure of TAL is.

MR. HORNE:  Okay.  With respect, Your Honor, we do believe that president of strategy does convey some responsibility for the company's operations.

THE COURT:  That's just not accurate.  That's a term that not all companies even have that.  You can't ask me to infer about a foreign company what the meaning of that term is with respect to his access to information, his span of control.

I don't even think you could do that in a U.S. context.  It's not the case that -- neither one of us know if Google has it as a president for strategy.  We don't know.

It's not a standard piece of a corporate structure such that I can make reliable enough inferences as to what that implies about a person's span of control, information base, daily responsibilities, et cetera.

You could buttress that with allegations, but there just aren't any that I saw here with respect to Peng versus Ding, and you're left with the bare invocation of his job title and the fact that he previously worked for Mackinzie.  That's just not a whole lot to go on.

MR. HORNE:  I think I understand the Court's point, but I think in this case this is something that goes directly to the company's strategy.  The company has to change from one kind of company to a different kind of company because

75 to 80 percent of their business --

THE COURT:  That would make sense, for instance, if you told me what the strategy department did or how many people were in it or what it meant to be the president of the strategy department.  I just don't have anything as to that.

"Strategy" is a very general term.  I completely understand the allegation, which is that TAL's business needed to be radically remade.  And so it stands to reason that somebody involved in strategy would have something to do with that.  I get it.

But the difficult you have is, as we all know under *Tellabs*, et cetera, your inference of scienter can't be so-so. It's got to be pretty strong.

You're asking me to infer scienter based on the fact that TAL needed to make, in your telling, a strategic shift and so therefore it must have run through this person who is the president of strategy.

You don't even have an allegation that says he was at the top of that heap.  That's not just persnickety.  You need to have it, especially with respect to a non-United States company.  But I think even with respect to a United States company you need to have it.

MR. HORNE:  I understand.  I have run through what we have and that's what we have.

THE COURT:  Okay.

MR. HORNE:  As to Jackson Ding, if you're the CFO or the CEO, you're pulled in all sorts of different directions. You have to make strategic decisions for this, that, and the other.

If you're the head of investor relations, you have one job: communications with investors.  Your job is to make sure those communications are accurate --

THE COURT:  But you're asking the wrong question.  The question is, is whether or not Mr. Ding does or does not have scienter.  And there is of course -- public statements are at the heart of every securities claim and the heart of yours.

It's also entirely possible that the investor relations person is a comms person who is a wordsmith who was given information from others, in which case that kind of investor relation jobs sheds no inferential light on whether someone does or doesn't have scienter.

So saying that a person is in charge of investor relations is meaningful if it means something other than a wordsmith.  Again, same problem with Ding.  The job title doesn't shed that much light on this issue, let alone the *Tellabs'* level of scienter required.

MR. HORNE:  In this case, Your Honor, we know he's not a wordsmith, in part because he appears on investor conference calls.  He's out there and discussing things.  He's not just a guy who adjusts the language in a press release.

THE COURT:  I get that.  Wordsmith is the wrong shorthand.  I see that stuff.

But I think the difficulty you have is that the inference of scienter needs to feed off some kind of disjunct between that which is said and that which is known, and there's nothing intrinsic about the title "investor relations" that suggests knowledge of what's happening behind the curtain.

Somebody can be someone who speaks on analyst calls or puts together writings on behalf of a company and they're very skilled at it, they're very upfront; but that doesn't mean they have that background knowledge behind the curtain that triggers that scienter-causing disjunct between that which is known and that which is said.

MR. HORNE:  In this case I think the allegations based on the nature of the statements, that bridges the inferential leap.  These are statements that were made in writing ahead of time.  They were very specific.  They said, "We are complying with this particular law."

THE COURT:  Right.

MR. HORNE:  "And we are doing it by ending academic training."

THE COURT:  What Mr. Marino is gonna get up and say is the question is not whether that statement was made, among other things, the question is whether to the extent Ding is

the maker for, you know, our newish body of law on this -- if he's the maker of those statements, did he know something that renders them reckless?

What you're saying is "We know he must have known something about it because his title was director of investor relations." What I'm saying to you is I don't hear that title as being sufficiently clarifying without some other facts that provide some insight into what his role is in preparing those statements, researching those statements, or just in the company in general.

MR. HORNE: I understand the Court's point, but I do want to point out under *Avaya* the Third Circuit was extremely clear that every case presents different facts.

THE COURT: Sure.

MR. HORNE: And you have to look at the facts in totality.

THE COURT: Right.

MR. HORNE: In this case it isn't -- in totality to determine whether there's a strong inference of scienter or recklessness. In this case Mr. Ding made statements that were so -- statements were made by the company that were so premeditated and so far off the truth and so specific that they make up for any deficiencies in the descriptions of his title.

It's possible his role was -- you know, I know the

Court took back "wordsmith."  It's possible his role was drafting things based on things that he was told, but that's an inference that is no more plausible than the inference that he is actually getting information.

THE COURT:  The slippage you just got to is the whole problem.  Right?  That's the problem you're having.  Right?

You're falling back on the normal 12(b)(6) *Iqbal/Twombly* plausibility; but when it comes to scienter, which is why this matters, you need to do better.  And that's the difficulty.

I understand that if this were subject only to 12(b)(6) *Iqbal/Twombly* you'd have a better argument, but because the reason we're concerned with what Ding knew or didn't know is about scienter.

You can't fall back on plausibility.  You need to have it be the better inference.  It's more than that.  I think you just haven't done that by saying investor relations.  So that's at least a preview of where I am on Mr. Peng and Mr. Ding.

What are you gonna do about this thing you mentioned at the outset, which is -- I saw the problem.  I'm not sure what to make of it, which is that the premise of the CEO -- the way you pled this, I thought it was a typo because in the papers it's just not argued this way.  It's not argued as if it's anything but a typo.

MR. MARINO:  Your Honor, can I ask you to speak into the microphone.

THE COURT:  I'm sorry.  I have the microphones.  I'm sorry.

MR. MARINO:  No, no.  Please.

THE COURT:  I think the difficulty is -- Mr. Marino, it works?  Can you hear?

MR. MARINO:  I can hear you perfectly.

THE COURT:  I don't know if you missed any good stuff but --

MR. MARINO:  I didn't just perk up when the important stuff started coming up.

THE COURT:  Here is the difficulty:  The inference of the CEO scienter makes no sense in terms of the four corners of the complaint because the CEO is alleged to no longer be working there before any of the relevant events began.

How do you propose to solve that?

I don't know if Mr. Marino is gonna care, but just in terms of the four corners of the complaint, the allegation just flat doesn't work.

MR. HORNE:  We're happy to handle it in one of two ways: either file a request for judicial notice and we can cite their own proxy statements which state that he continued to be CEO or we can file a supplemental complaint under Rule 15(d).

It is a fact that he was the CEO during the entirety of the class period.  And one alternative is for you to dismiss based on that fact, but we'd be right back here.

THE COURT:  I understand the point.  What I'm really asking is whether Mr. Marino -- whether the defendants are comfortable with me proceeding on the assumption that Mr. Zhang was the CEO throughout the relevant period.

Or is that something that you'd object to, Mr. Marino?

MR. MARINO:  I don't have any objection to that, Your Honor.

THE COURT:  Mr. Marino, you're comfortable with me proceeding as if the complaint says he was the CEO from whenever it says he started being CEO until the end of the relevant period?

MR. MARINO:  Based on counsel's representation that that would have been his allegation but for the error, I have no problem with it.

THE COURT:  All right.  I think that solves it.

Mr. Horne, I assume that solves it from your perspective.

MR. HORNE:  Absolutely.  However the Court wants us to paper this to put it in the record, we'll be happy to.

THE COURT:  I don't think I'll require much paper. Mr. Marino's representation is in.

MR. HORNE:  Okay.

THE COURT:  I reviewed everyone's letters.  I saw everything.

Is there anything else, Mr. Horne, you want to say?

Mr. Marino is eager to get up.

MR. HORNE:  Nothing in particular, Your Honor.  We'll be glad to respond to Mr. Marino.  It's his motion.

THE COURT:  All right.  Thanks.

MR. MARINO:  Your Honor, with the Court's permission, may I use the lectern?

THE COURT:  Sure.

(Brief pause.)

MR. MARINO:  I appreciate you indicated what your inclination is.

THE COURT:  Yeah.

MR. MARINO:  Let me if, if I may, take you back to where we were last time.  I think at that time Your Honor zeroed in on what is the significant question here, the question on which the motion turns.

You said at page 18, line 10 to 13:  (Reading.)

All of that is to trade on a background assumption I have, but one that may or may not be warranted about the relationship between a legislative style command and then the follow-on fleshing out from a regulatory style entity.

We know what we have here -- now that we have looked at

this translation in detail, we know, as counsel has conceded, there's no definition of academic and it's to be fleshed out. Right?

So that was where Your Honor started. Then you said something I think is very significant and I'd like to address in some detail. At page 20 you said, line 11: (Reading.)

I think there's a little bit of lack of educating an American lawyer, me, not from you, but from your adversary -- you were speaking to me at this point -- about the role of these guidance documents and whether -- what has the force of law and doesn't.

So that was -- you know, that was your focal point. And then at page 30 you said, again indicating where you were at the time, very first line of the page: (Reading.)

When I look at the scraps here and there that are in the complaint that I need to credit at this stage, those look to me like they probably add up to a legislative style command, but it's a very hard and complicated question.

Then you were gracious in giving us the opportunity rather than dismissing it -- going through the step of dismissing the claim without prejudice and allowing to come back in and plead, you gave us the opportunity to come in and try to shed some light on what I think I've identified, as

Your Honor had identified, as sort of the question on which this turns.  Right?  The fulcrum on which this motion turns is certainly that question about force of law.

So despite your inclination at the moment to allow this to go forward, I was drawn to a comment that was made in this counsel's submission, and I'll draw your attention to that, as well.  That is the very first... just one moment, Your Honor.

(Brief pause.)

MR. MARINO:  It's at page 1 of their two-page submission.  After acknowledging that -- at the bottom of the second full paragraph and exactly as plaintiff said the double reduction does not define academically, indicating a term for later clarification, counsel has a point heading that interpretive guidelines are authoritative interpretation of the double reduction.

There at the bottom of that paragraph they cite to a University of Miami International and Comparative Law Review article citing Albert HY Chen's "An introduction to the legal system of the People's Republic of China."

So I got ahold of that in preparing for the argument.  With the Court's permission I'd like to hand up a copy and hand my adversary one, as well.

THE COURT:  Okay.

MR. MARINO:  (Tendered document.)

THE COURT:  Thank you.

MR. MARINO:  I'd ask Your Honor to take a look if you will at the very first paragraph, the first actually two paragraphs of this -- Chapter 6 of this book, which is called Sources of Law and the Law-Making System.

It struck me that that was very much where Your Honor was focused last time around and therefore where we were focused this time around.

It begins:  (Reading.)

A preliminary question which might be considered in examining the sources of law in mainland China is whether the model or preconception of law used in describing Western legal systems is appropriate in the Chinese context.

For example, in studying the sources of law in the English legal system, the general assumption is that law consists of rules and principles recognized by the courts of law as law and applied by them in deciding cases.

This model of law --

Which of course pertains here.

-- places the judiciary at the center of the legal system, and the model is entirely appropriate for a legal system which attaches the

highest value to an independent judiciary acting as the custodian of the law and upholding the rule of law in disputes between government and individuals as well as among individuals or private bodies in society.

In China, however, the courts are not so conceived of as having such a special or sacred position within the legal system, nor do they command such an esteemed status in society.

Furthermore, the principle of the supremacy of state law as against the edicts, policy documents and exhortations of the CPC and the orders, directions and instructions of senior officials has not yet been firmly established in constitutional theory, and, to the extent that the principles of socialist legality have indeed been officially affirmed verbally, they have not been fully observed in practice.

The effect of these factors has been to blur the distinction between law and policy and to stimulate students of the Chinese legal system to reflect upon their assumptions or definitions as to the nature of law.

It goes on and the second paragraph I think answers the question that Your Honor had as a sort of foundational one

quite specifically.

(Reading.)

At one step in the construction of his famous theory of the concept of law, the English legal professor *[sic]* HLA Hart invented the idea of the internal aspect of rules or the internal point of view.  Officials are said to have adopted an internal point of view towards a rule when they accept it as official, as legitimate, as binding on them, and believe that they are under an obligation to apply and enforce the rule.

Now, it is clear that officials in the huge Chinese party-state bureaucratic apparatus adopt such an internal point of view towards many party policy documents --

I would suggest that this is one such document.

-- providing for general principles or rules in handling governmental matters.  The documents may even be followed and applied by the courts themselves in certain circumstances.  The question therefore arises as to whether Chinese, quote-unquote, law embraces such policy documents.

It is submitted that the question should still probably be answered in the negative.

It should be answered in the negative for precisely the

reason a completely ambiguous rule would be struck down on a regular basis by federal and state courts in this country because when you have a law it tells you what to do --

THE COURT:  Mr. Marino, none of this cuts your way. I'm not sure I even -- I'm not even sure why you're invoking this.

What the person who wrote this is saying is that -- we're gonna end up at first principles in a crazy way, but if you take, for example, Oliver Wendell Holmes's command theory of the law, which is to say the law is merely the command of what the sovereign is doing, all that this person is saying is that while -- he's misunderstanding Hart, but under Hart's rule of recognition way of talking, in the United States the command of the sovereign would be reflected in the law.

What he is saying is that in the People's Republic of China the command of the sovereign is also reflected in statements that we would call policy in the United States from these various other apparatuses.

The problem with that for your argument is that's what the double reduction is.  The distinction he's drawing is, gee, we don't want to call what happens in the PRC law because it doesn't fit our post-*Cooper v. Aaron* judge centric conception of what law is, but that doesn't cut your way. That cuts your adversary's way.

MR. MARINO:  I completely disagree with that,

Your Honor.

THE COURT:  How do you figure?

MR. MARINO:  The reason I disagree with you is here in the context of this case what we have is a plaintiff saying, "You lied.  You lied when you said, 'We're complying.'"

Right?  But how can you establish, how could you ever prove facts in support of that suggestion when the matter of what's been directed isn't clear by definition?

So without reference to Your Honor's point, which I take which is here the legislature --

THE COURT:  What do you mean the word "by definition?" How is it not clear by definition?

MR. MARINO:  Because you can't lie when you say, "I'm not violating this principle, I'm not violating this opinion, okay, because I'm not teaching academic courses as I interpret that term."

What's missing here and where I thought Your Honor was going last time around was a clear directive as to exactly what is to be respected, honored, followed.

THE COURT:  Mr. Marino, here is what I don't get:  What you just read out loud is a critique of the idea that a judicial decision might function in a Chinese context the way we see law as functioning, but you're not trying to knock back a judicial decision, you're trying to knock back what I now have a translation of.

Let me just... (Reading.)

Listed companies must not invest in academic tutoring institutions through stock market financing. Academic tutoring institutions must not seek funding through public listing.

What even begins to be ambiguous about these words? They're just straight-up directives.

MR. MARINO: They're directives to do something at the heart of which is ambiguity. What does it mean to teach --

THE COURT: Well, but here is the problem, Mr. Marino. Here is the problem:

I appreciate that words are ambiguous, but I also appreciate that sometimes -- what is a frog? The full meaning of the term "frog" might not be fully specified, but that doesn't mean that sometimes we can tell what a frog is.

Your adversary has put a great deal, a great deal of allegations into a complaint that strongly suggest that by any conception of what "academic" means TAL was involved in academic tutoring.

I agree there may be moments at the edges where there is ambiguity but, number one, this doesn't look like that; and, number two, you still have a massive undisclosed risk that interpretive authorities and enforcement authorities might disagree and the magnitude of that risk is generated by the power of the allegations that they're engaged in academic

tutoring.

MR. MARINO:  Well, I think we're not focusing for the moment -- I'll meet your frog analogy with one of my own in a moment, but I think what we're not focusing on is exactly what was said.  We looked at it last time.

We are continuing -- we're not doing this anymore and we're continuing to work with the authorities cooperatively to make certain that we're doing everything, if you will, according to Hoyle.  That's the gist of what is in the documents that are said to be at the heart of this lawsuit.

This is the problem:  I understand the inclination to allow allegations in a complaint to go forward.  I understand the evolution from the days of *Conley vs. Gibson* to *Iqbal* and *Twombly* and introducing plausibility.  I get all that.

But here is the problem:  I am now looking -- I know you don't like this article but --

THE COURT:  I think it cuts the other way.

MR. MARINO:  Respectfully of course I really do strongly disagree with that.  If you look at page 78, the last sentence --

THE COURT:  Hang on for one second.  Let me flip there.

MR. MARINO:  Sure.

THE COURT:  Go on.

MR. MARINO:  The last sentence there in the first page, page 78:  (Reading.)

Using the simple device suggested by these theories of tracing the authority of each norm-creating organ to the document which authorizes the creation of the norm and then to the organ which issued that document and continuing the tracing process until the Constitution is reached, it is possible to understand Chinese law as a hierarchal system of norms unified and ultimately legitimized by the provisions of the PRC Constitution and to distinguish legal norms from non-legal norms such as mere policy documents.

What Your Honor is saying is that proves their point, it's good enough over there to have opinion and policy statement.

THE COURT:  No, no, no --

MR. MARINO:  And to over here treat that as --

THE COURT:  Mr. Marino, your point is that this is a mere policy document.  The fact that there is a spectrum in any legal system and a hierarchy in any legal system from that which is most authoritative to that which is less authoritative to that which is no longer law, that is to say the sky is blue.

The question you need to ask and answer is why from the fact that there is a concept called a non-legal norm that this

piece of paper in front of me translated, which is pled and looks like a legal directive, it now fits into the category of non-legal norm.

MR. MARINO:  The description of it -- as you say, it's pled, the manner in which it is pled, is simply not consistent with what it obviously is.

Here is my analogy:  A parent says to the child, "I want you to not be home late.  Don't be home late tomorrow night.  Okay?"

And the backward-looking statement the following morning is, "Did you do as I told you?

"Yes.  I did."

"When did you get home?"

"At midnight."

"Well, it's an hour after 11:00.  That's late."

That's what's going on here.

THE COURT:  That's not what's going on --

MR. MARINO:  No, Judge.  The reason is --

THE COURT:  This is a state organ that has issued a directive in mandatory language --

MR. MARINO:  Saying it --

THE COURT:  In your analogy -- the problem in your analogy is you're not talking about a kid who comes home at 11:00 or midnight.  You're talking about a kid, number one, who comes home on the allegations at 4:00 in the morning; and,

number two, you're talking about a massive unclosed risk that the subject of the regulation is getting it wrong.

MR. MARINO:  Is it undisclosed?

THE COURT:  If you want to lean on the warnings you have made, they are about as generic as possible.

MR. MARINO:  They are generic but they're there for a reason and they're there to be respected and they can't be ignored.

THE COURT:  But there's a whole body of law that you and I both know and the Supreme Court almost passed under this term but gave up on the case a few weeks ago, but the idea that generic invocations of the background law, that doesn't save you here.

MR. MARINO:  Your Honor, you're going where you're going, but let me say this to you:  I think it's wrong, but I want you to just journey with me for a moment --

THE COURT:  Sure, sure, sure.

MR. MARINO:  -- beyond this pleading stage.

Now we have gone through discovery.  We'll skip over all the things that will happen there.  Now we're at the trial.

Here is what we're going to have a trial over:  I am going to say this is not academic, and I'm gonna put an expert on to talk about all the ways in which these things are not academic.  They're going to say, "No, it actually is

academic."  And you come back to the notion of "You lied when you said you were abiding by this."  Right?

They're gonna ask a jury to believe that we lied when we said we were doing something, specifically not doing academic tutoring, that was proscribed.  We're gonna get into the details of what it really means to be non-academic versus academic.  I gave you my music teaching analogy last time and mathematics and all that stuff.

THE COURT:  Right.

MR. MARINO:  And you will say that's a fact question for the jury.  What I say to Your Honor is, is it really?  Is that a fact question for the jury to determine when you are reading this and you know that as the judge your job is to interpret the law, right.  You're gonna instruct the jury.

What are you going to tell them "academic" means?  Whatever was in the mind of the person who wrote the opinion?  Whatever is set forth in the aspirational statements of things that are going to come to fruition in three years?

How are you gonna instruct them?  You're gonna have to tell them something that in my view puts the Court in the shoes or the place of the pleading plaintiff.

THE COURT:  Mr. Marino, look, we're at a 12(b)(6) stage, and that just changes things in the way you're talking about.  I know how you're gonna try this case.  You're gonna get up and say -- you're gonna throw something on the wall

that's complex, they're gonna throw something on the wall that's complex, and you're gonna get up and say there can't be scienter.  This is too much complexity.

That's not a complicated argument for a lawyer of your caliber to make to a jury.  You're making a defense now.  It's a real defense.

MR. MARINO:  Let me say it this way:  I will admit to you this is a concern to me in many contexts because I think the bending over backwards to find a cause of action, I understand.  *Printing Mart-Morristown* is the New Jersey case, there are any number of federal cases.  I like that one because it speaks in terms of searching for a cause of action and all that business.

But the reality is, looking for the fundament of a cause of action, conducting a thorough search for the fundament of a cause of action is different in kind from imagining a cause of action.

When you said:  "I know they didn't define it, but, come on."  Your Honor used this, you said, "By any definition it's academic."

No, it's not.  No, it's not.  They know it.  The reason they --

THE COURT:  Mr. Marino, here is the thing:  That may be a great jury argument.  The fact that it meets -- that these allegations in my judgment plausibly -- beyond plausibly, I

don't think it's close -- show that TAL was continuing to engage in academic work, that doesn't mean after summary judgment you're not gonna win.  It doesn't mean at trial you're not gonna win.

But as you know we're just in a different place.  It's a different standard here.

MR. MARINO:  I'm just confused about where Your Honor was when you said, "I want to know if this has the force of law."

THE COURT:  But I now believe it does.

MR. MARINO:  Based upon?

THE COURT:  The language is totally directive.

MR. MARINO:  Directive.

THE COURT:  Yeah.  The language -- this is why I assume that you and your adversary were sparring a little bit in the translation between "must" and "should."  The language is entirely directive, and I was worried -- I didn't go back and re-read the transcript.  I was worried from jump that what might be lurking behind door number one was completely different than the paraphrase in the complaint.

I have now read the translation and it's not different.  It's a directive statement from an entity that's pled to be a law-giving entity, and, by the way, Mr. Hung-yee Chen suggests is also a law-giving entity.  It looks straightforward to me.

MR. MARINO:  My confusion or misunderstanding, I guess,

is when you say does something have the force of law, I think of that not so much as whether something is stated in a generally directive capacity but whether what is stated actually is supported by the law.  "You have to do it" as opposed to "I'd like you to do it."

THE COURT:  Right.

MR. MARINO:  You talked last time about -- we talked last time a little bit about virtue signaling, and I get what they're doing.  They know they have a problem and the problem is people are spending in many cases not disposable income on competing with one another to make sure that their child doesn't lose out in the race for whatever it -- the brass ring out there of education and so forth.

But at the end of the day, there is an easy way to do this.  You make quite specific rules.  Then you say, "You have to do this."  That's what it is.

THE COURT:  The language I read to you a minute ago does that.  It's directive language about public companies not being involved in this and TAL is a public company.

The thing you invoked last time was the specter that when I got under the hood and looked at the translated documents I would see something that's 180 degrees the other way.  It's not 180 degrees the other way.  It's just what was represented.

It's mandatory language from a state organ that per

Mr. Hung-yee Chen and also just the way it's pled has the force of law.

What does the force of law mean is a very theoretical concept but it need not be. The sentence before the last one you read invoked the right part of Hart, which is about the rule of recognition, which is to say is different entities, different civilizations, different societies have different rules of recognition that tell you what the law is.

Here your adversary has pled that the double reduction and the interpretive guidelines function as law. I've look, as *Wright* and *Miller* tells me I can, to other sources. I haven't seen any reason to think that isn't right, and it speaks in a mandatory way.

And the critique you're left with, Mr. Marino, is that it doesn't speak in a sufficiently non-ambiguous way to which the problem is this is academic by any definition I can think of, the allegations are academic, and there's also an undisclosed risk that it is to be perceived ex post as academic.

That's a tough spot for you. I appreciate what you're saying. This could be an interesting summary judgment motion for me, and you could argue on summary judgment that there's no scienter because there's so much complexity. I get that. But right now at 12(b)(6) I think it's pretty straightforward.

MR. MARINO: I appreciate you're indulging me with this

conversation, Your Honor. I have to say it's troubling to think of a circumstance in which by admission the thing that we are supposed to have lied about, right, is not entirely clear; and if you give them the benefit of every reasonable inference, that doesn't change it.

In other words, am I gonna be able to say to the jury -- skip over the summary judgment stage for the moment.

Am I going to be able to say to the jury: Here is what a law looks like in the United States, and I'm going to give some examples. They all direct you what to do and notice is one of the absolute essentials of the due process guarantee, that I will know what it is that you are charging, and I will be put on at least constructive notice of whether my conduct is going to transgress the law.

Then I'm going to take an opinion described as such, a policy statement. And to me the critical words are the guideline, what this means, will be developed over time. I said this is what I think it means. What you think it means hasn't even been said. Give me a directive, don't do academic things.

Your Honor sort of brushes past the idea, academics is clear. By anybody's likes this is academic.

I say, well, I think that's not giving the benefit of reasonable inferences. I think that's creating something that isn't here, and that's not the function of the Court. The

judge's job --

THE COURT:  Here is the thing --

MR. MARINO:  The judge's job is to tell us what the contract says --

THE COURT:  I understand --

MR. MARINO:  And the jury comes in and says --

THE COURT:  But here is what I'm saying:  There's a lot to be said about what you just said.

MR. MARINO:  I'm sorry.

THE COURT:  There's a lot to be said about what you're saying.  When the 36 Act was passed, the United States statutes were generally just about as specific as this one.  The kind of statute you want to invoke that has a 17-part definition of academic is itself a creature of recent times.

When the statute that the plaintiffs have invoked was passed, there were a lot of U.S. statutes like this, number one.  Number two, we routinely tolerate open-textured laws that are then subject to later elucidation.

Number three, the fundamental problem you have is that this conversation is too abstract.  The creative thinking curriculum, the humanistic creation curriculum as pled, these are blowing past any definition of academic.

What you're saying is there is potential ambiguity.  All I'm saying to you is that's -- for give the pun -- an academic point because what is pled about the courses is

academic by any definition.  It's just academic by the definition.

You don't have to buy that -- I don't have to buy that on summary judgment and the jury doesn't have to buy it, but in terms of plausibility --

MR. MARINO:  May I ask why don't you have to buy it on summary judgment?

THE COURT:  Well, I'm saying I don't know what kind of arguments will be made to me in summary judgment.

MR. MARINO:  But saying that you wouldn't have to accept that, I agree with that, but I think it's instructed as to what's happening here as well --

THE COURT:  Because, Mr. Marino, here's is what could happen on summary judgement:  On summary judgment you could get a whole bunch of Chinese law experts and put it in front of me and your adversary could rest on this book and I would be asked by you to say whether a reasonable jury could conclude that that which is in the record at that point does or does not meet that definition.

That's how it could come up.  I have no idea if that's where it goes, but it's not just in a jury context where this could be an issue.  It could be an issue in terms of what a reasonable jury could think.

But right now we're in 12(b)(6).  You don't have any counterweight.  I get that, but you don't have it.  The

allegations as to the creative thinking class, the humanistic, those are clearly academic.  Clearly.  You don't have to clear up the outer limits of academic to know those are academic.

MR. MARINO:  I'm not sure about the outer limits, but I do think that to address one of your three points that I think we haven't really talked about much is the Private Securities Litigation Reform Act.  That's not the 34 Act.  The 34 Act that we know the historical circumstances in which the law was passed and the reasons why it was passed --

THE COURT:  Right.

MR. MARINO:  -- there's no dispute about that.

THE COURT:  Right.

MR. MARINO:  But the Private Securities Litigation Reform Act I believe imposes upon the pleader, the plaintiff, a much, much higher obligation than Your Honor is affording it.

I do think there's some tension between the mandate, the legislature's mandate, and it's no opinion, a mandate, of the Private Securities Litigation Reform Act and the notion of a court giving the benefit of all reasonable inferences.  But there's an outer limit to that.

The reality of this is, Your Honor, as you read this thinks this is not complicated, this is straightforward.  And we're having a nice chat back and forth, it's enjoyable somewhat, but at the end of the day I understand where you

are.

I do respectfully disagree with that, but that's not terribly meaningful.  And at the end of the day, I think we're gonna be on a path of -- there's gonna be a problem here as we go forward, and it will develop in the early stages of discovery.

The problem is going to be a direct product of this germ of mischief which is letting this -- this is good enough, this is pled well enough.  We're not even now talking now about dismissing without prejudice and coming back and being specific.  This is good enough, it goes forward.

THE COURT:  Right.

MR. MARINO:  And I think -- my guess is we haven't seen the last of one another on this subject and another stage.

THE COURT:  Right.  But that doesn't surprise me.  I get it.  I hear -- there is a distinct problem at issue here. I get it.

The PSLRA of course changes what the 34 Act did, but you understood why I mentioned the 34 Act.  It was to say that the expectation that statutory terms are more specific is actually a modern one.  Put that aside.

I'm not even close to relying on PSLRA, I don't think. Of course not.  Here is the thing:  I understand the arguments you're making.  I think they're just arguments that at a different stage you're gonna have a chance to make them, but

today on the complaint I don't think it's there.

MR. MARINO:  I think we have beaten the horse to death and principally me, but I certainly don't think these individuals belong in the case at all.  I don't think Your Honor has a different view of that.

THE COURT:  Mr. Peng and Mr. Ding I'm of course going to dismiss from the case.  The CEO is in a different spot.  I appreciate you're not fighting over the 2020 versus later stuff, but I think the CEO stays in the case.

MR. MARINO:  You think the CEO stays in the case on an apex?  He's --

THE COURT:  Look, it's essentially -- your adversaries I noted didn't use the word "core operations doctrine" because there's controversy about that.  I get it.  But I think under *Avaya*, given how central this change was to TAL in particular and given the massive spin-around that would have been required, the idea that the CEO doesn't have *Tellabs* scienter, that doesn't make sense.

MR. MARINO:  My problem with that reasoning is -- and I ask Your Honor to give it a moment's thought -- what flows from that is a principle of law that's problematic, which is what Your Honor just said about the CEO's function at TAL could be said about the CEO of virtually any company anywhere.

The notion that because you're generally in charge of the whole program you're gonna answer personally for it, I

think -- I just ask you to give some thought.

THE COURT:  I hear that problem.  The point is, there's no strict liability under our securities laws for CEOs completely.  The difficulty here is that this is pled -- I don't know if it's true, but this is pled, this kind of academic tutoring, as such a massive overwhelming part of TAL's business, and the regulatory change is such a big and public shot across the bow and the statements are so definitive to investors.  All of that puts us in a situation where that's why *Avaya* is relevant.

In *Avaya* the scope of the wrongdoing, the round-tripping, et cetera, or maybe that's *Supreme* I'm thinking of, forgive me.  But the scope of it in *Avaya* is big enough that the senior leaders, there's even a *Tellabs* inference that they know -- that they have to have scienter. I think that's got to be right about the CEO here.

Mr. Marino, step aside for just a second.

Mr. Horne, why do you care if the CEO is in this case? Why do you care if the CEO is in this case?

MR. HORNE:  I think we have alleged the CEO scienter. We also think the CEO is a wrongdoer and we see no reason for him to be dismissed.

THE COURT:  But is this going to make any difference in your case?

MR. HORNE:  It is going to make it easier to take his

deposition should he leave the company. He'll be a defendant and we can take the deposition. Otherwise it's going to be very difficult to do so.

MR. MARINO: If they just want his deposition, I'll represent that I'll make him available.

THE COURT: I get where Mr. Marino is coming from. Just take his deposition. Mr. Marino just represented to you on behalf of the company that he's going to be made available.

What's complicated?

MR. HORNE: We will also want to impute a scienter to the company, and having him dismissed on the motion to dismiss makes it more difficult to do so.

MR. MARINO: They surely don't plead enough to warrant that.

THE COURT: Hang on a second. I just wrote a pretty long opinion on imputation of scienter. At least the judge you're in front of has ruled that imputation can run from a non-defendant to a company.

Maybe one day the Third Circuit will overrule my decision or will in another decision say that's wrong, but at least for me you don't have that impediment, just as a practical matter.

Peng and Ding I think are not close to the line. They have nothing to do with this case, at least as pled. But if really what you're talking about is practically wanting to

impute scienter -- if you're talking about the deposition, Mr. Marino has just given it to you, and he can obviously be banked on.

Then the question is imputation of scienter. I don't think you're right on the law. You're certainly not right on the law as to me, and also my decision is not terribly avant-garde. Imputation of scienter to a company from a CEO --

MR. HORNE: Not at all, Your Honor.

THE COURT: It's the background obvious way to impute scienter to a company.

MR. HORNE: It's absolutely correct. What I'm worried about is a decision finding that the complaint doesn't allege the CEO scienter with particularity and dismissing the case on that basis, and that is something that is going to be an impediment to our case going forward.

THE COURT: But I'm asking you why.

MR. HORNE: A finding that -- if we were to prove our allegations at summary judgment, there's a chance they wouldn't be sufficient because of the Court's earlier order on the motion to dismiss that becomes law of the case.

For that reason we think it makes sense to rule on the papers --

THE COURT: The way to reduce your risk of that is to simply walk away from the CEO. If what you're afraid is that

I'm gonna issue a ruling that's gonna become the law of the case that you think is gonna bind you at Rule 56 from making an imputation argument, then just walk away from the CEO.

MR. HORNE:  Understood, Your Honor.  I understand from the discussion today that the Court is unlikely to grant the motion to dismiss, but unlikely and definitely won't, different standards.  We are reluctant to dismiss the CEO --

THE COURT:  Why don't the two of you spend five minutes talking.  Just spend the five minutes now.  The practical points you've made about getting a deposition, solved.  The practical point about imputation, I don't think really an issue.

The notion that failure to plead enough as to scienter might become law of the case at a Rule 56, that strikes me as a surprising legal proposition, just surprising.

Can you all talk for a moment about whether you need the CEO.

MR. HORNE:  Will do, Your Honor.

THE COURT:  Don't go too far.

(Brief pause.)

MR. HORNE:  Your Honor, if the motion to dismiss is denied as to the company, we can dismiss the CEO without prejudice and subject to the agreement that he will sit for a deposition.

MR. MARINO:  May I have one moment, Your Honor?

THE COURT: Sure. Of course.

(Brief pause.)

MR. MARINO: I want the CEO with prejudice, Your Honor. If counsel is unwilling to do that, I'll ask Your Honor to do it. I don't understand the without prejudice addition to that.

THE COURT: If you can't agree, you can't agree.

MR. MARINO: Right. The reason I don't think he belongs in the case, I think they know he doesn't belong in the case, and I think the problem with leaving him in the case is as I've described.

It would wash quite broadly and I think have implications in other cases that would not be warranted.

THE COURT: Okay.

MR. MARINO: I do have one last question for you.

THE COURT: Yes.

MR. MARINO: I'm gonna withdraw it before I ask it. Maybe some other forum we'll have the question, but thank you very much for your time.

THE COURT: Thank you, Mr. Marino.

Mr. Horne, anything you want to add?

MR. HORNE: We're happy to dismiss the CEO without prejudice if the opinion upholds the company. That's all.

THE COURT: I'm not going to issue an opinion. We spent enough time on this. I think everyone understands where

I am.

I'm gonna dismiss Mr. Peng; I'm gonna dismiss Mr. Ding. There's just no showing -- there's no allegations of scienter as to them.  As we discussed, the inference from their titles is very faint, and that's just not how scienter works post-PSLRA of course.

With respect to the company, I'm gonna deny the defendants' motion.  There is ample information here that there is -- ample allegations in the complaint with respect to the creative -- I keep failing to remember these courses, the creative thinking course, the humanistic creativity course, that those are just flat-out prohibited academic courses under different names.

There are any number of things that support that. There's the way that the courses are described, there's the fact that they're closely similar to what allegedly was offered before, there's the fact that it's similar to what this company offers outside of China, and to a limited extent there is also the inference from the fact that they are offered on a grade level basis, also what the former employees say, especially former Employee 4, is relatively helpful as to all of this.

As to the company scienter, who it might or might not be imputed to, how aggregation of scienter might or might not work, all interesting and complicated questions but

fundamentally this was a massive portion of TAL's business.

This was a definitive -- let me walk that last word back. This was a dramatic change in the legal regime, and given that kind of dramatic change in the legal regime there is no way in my judgment that these allegations don't add up to scienter for the company, given the fact that this was such a big deal, this was such a big part of their business. And the kind of change that would have been required to render the false statements true would have meant really a turning around of the ship of a kind that the company could not have missed was not being done.

I'm going to grant the motion to dismiss as to Peng. I'm going to grant the motion to dismiss as to Ding. I'm gonna deny the motion to dismiss as to TAL Education Group.

Mr. Horne, over to you. What's your view on Mr. Zhang? Are you going to dismiss him without prejudice at this point?

MR. HORNE: We can dismiss him without prejudice, Your Honor.

THE COURT: Okay. Then he's dismissed without prejudice.

As I said, I didn't want to belabor this and I'm not even -- as you all can see, not building out a full opinion even verbally. I don't think it's necessary.

Anything else we should cover? I'm gonna put out a simple text order reflecting this today.

MR. HORNE:  Nothing from plaintiffs, Your Honor.

THE COURT:  Mr. Marino?

MR. MARINO:  No, Your Honor.

THE COURT:  All right.  We're adjourned then.  Happy holidays to all and we're done.  Thank you very much.

MR. MARINO:  Thank you, Your Honor.

MR. HORNE:  Thank you, Your Honor.

(Which were all the proceedings held in the above-entitled matter on said date.)

*   *   *   *   *

*United States District Court*
*District of New Jersey*

**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court Reporter of the United States District Court for the District of New Jersey, do hereby certify that the foregoing proceedings are a true and accurate transcript from the record of proceedings in the above-entitled matter.

*/S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

Official U.S. District Court Reporter ~

District of New Jersey

DATED this December 26, 2024

*United States District Court*
*District of New Jersey*